Filed 11/12/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C071432 |
| v. | (Super. Ct. No. 10F02227) |
| GERARDO VILLASENOR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Roland L. Candee, Judge. Affirmed.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Michael P. Farrell, Assistant Attorneys General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Gerardo Villasenor, a Sureño gang member, shot two rival Norteño gang members on two separate occasions. He was 17 years old at the time of the shootings. With respect to the first shooting, defendant was charged with one count of attempted murder (Count One) and one count of shooting at an occupied motor vehicle (Count Two). With respect to the second shooting, he was charged with one count of attempted murder (Count Four) and one count of shooting from a motor vehicle at another person outside that vehicle (Count Five).[1] Each count alleged a gang enhancement; with the exception of Count Two, each count also alleged defendant personally and intentionally discharged a firearm causing great bodily injury. After the trial court severed trial on the counts relating to the first shooting (first trial) from trial on the counts relating to the second shooting (second trial), separate juries found defendant guilty of each crime and found each enhancement allegation to be true. Defendant was sentenced to serve an aggregate indeterminate prison term of 50 years to life, plus an aggregate determinate prison term of 24 years, eight months.

On appeal, defendant contends the trial court prejudicially erred and violated his federal constitutional rights by admitting into evidence statements defendant made to police after he invoked his right to remain silent. Specifically, defendant argues he clearly and unequivocally invoked his right to remain silent during his interrogation by telling the interrogating officer—13 times in the span of 14 minutes—to take him home,

---

[1] Count Three involved the first shooting and was alleged solely against a co-defendant, Kristen Clancy. This count charged Clancy, the driver of the car used during the first shooting, with being an accessory after the fact. She pleaded guilty to this charge and the prosecutor dismissed Counts One and Two as to her. Defendant's older brother, Benjamin Villasenor, also a Sureño gang member, was also charged in Counts One and Two. Because he and defendant have the same last name, we refer to him as Benjamin. The case against Benjamin was dismissed for lack of evidence after he presented his defense case.

and during this period of time further told the officer to call his parents so they could pick him up. He also argues the interrogating officer's refusal to honor his invocation of the right to remain silent rendered the remainder of his statements involuntary.

We agree defendant invoked his right to remain silent. Because the interrogation should have stopped when this occurred, but did not, the admission of defendant's subsequent statements violated his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*). However, we also conclude the trial court's error in admitting these statements was harmless beyond a reasonable doubt. We reject defendant's related claim that statements made after he invoked his right to remain silent were involuntary under the totality of the circumstances.

Defendant also asserts the trial court prejudicially erred and violated his state and federal constitutional rights in the second trial by denying his request for a removal order for a proposed defense witness, who was an inmate in an out-of-county prison at the time of trial, thereby preventing him from calling a necessary and material witness, the evidence is insufficient to support his convictions, and a clerical error in the abstract of judgment must be corrected. We disagree with the first two contentions. Because defendant's showing of necessity and materiality was lacking, the trial court neither abused its discretion nor violated defendant's constitutional rights by denying his request to remove this particular inmate from prison. The evidence was also more than sufficient to support defendant's convictions and the enhancement findings with respect to each shooting. We do, however, agree the abstract of judgment must be corrected. We therefore order correction of the abstract of judgment and affirm the judgment.

FACTS

We recite the facts in the light most favorable to the judgment, drawing all reasonable inferences in support thereof. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

3

However, because we conclude there was a *Miranda* violation, we omit from our factual recitation any statements defendant made to police after he invoked his right to remain silent.

### *The First Shooting*

Armando Lopez was a member of the Norteño criminal street gang and routinely wore red to signify his membership in the gang. During the early morning hours of January 24, 2010, he and three of his roommates left a party and returned to their house on Kesner Avenue in North Sacramento, near Del Paso Heights. One of the roommates drove another roommate's car to and from the party. On the way home, they stopped to pick up some fast food. Each of the roommates had been drinking. Lopez appeared to be the most intoxicated. When the other roommates got out of the car to bring the food into the house, he stayed in the back seat "mumbling." His roommates decided to leave him there while they went inside to eat. A short time later, Lopez managed to get out of the car. But instead of coming inside the house, he walked over to his car, which was also parked on the street in front of the house, and got into the driver's seat.

As Lopez was changing cars, a group of Sureños was driving through the neighborhood. Raquel Benavidez, seated in the back seat behind the driver, testified the driver was Kristen Clancy (who went by the nickname "Huera"), defendant (who went by the nickname "Lalo") was seated in the front passenger seat, defendant's older brother Benjamin (who went by the nickname "Playboy") was seated in the back seat behind defendant, and Gisela Chaveste (who went by the nickname "Bubbles") was seated in the middle of the back seat. According to Benavidez, when they passed a Mexican man sitting in a car on the side of the street, either defendant or his brother told Clancy to stop the car, which she did. Defendant and his brother got out of the car and walked over to the man. Defendant asked: "Do you bang? Where are you from?" Benavidez

4

understood these questions to be a gang-related challenge. Defendant then reached into the car and lifted up the man's shirt. Seeing a red belt, defendant said, "he's a Norteño," pulled out a handgun, and shot him twice. Defendant and his brother then got back in Clancy's car and the group drove away as defendant said: "I hope he dies." Benavidez's testimony was largely consistent with prior statements she made in March 2010 to a school counselor and to a police lieutenant who was called by the counselor.

The man defendant shot was Lopez. One of the bullets passed through the back of Lopez's neck and then struck the passenger side door, where it remained until recovered by police. The other bullet struck Lopez in the shoulder, shattered his clavicle, fractured one of his ribs, and then lodged near his vertebral column, where it remained at the time of trial. His roommates heard the gunshots, came outside to investigate, and found Lopez sitting in his car, bleeding from his neck and shoulder. One of Lopez's roommates asked him what happened, but he "wasn't really making any sense." Another roommate called 911. Police were the first to arrive at the scene. One of the responding officers, who stayed with Lopez until emergency medical personnel arrived, asked him if he knew who shot him. Lopez said he did not. A short time later, Lopez was transported to University of California at Davis Medical Center. He survived his encounter with defendant.

Three days later, a detective with the Sacramento Police Department spoke with Lopez at the hospital. Lopez admitted to being a Norteño and confirmed he was wearing a red belt the night he was shot. Thereafter, in April 2010, after Benavidez provided her statement regarding the shooting, the detective again contacted Lopez and showed him several photographic lineups, one of which included defendant and another included Benjamin. Lopez did not positively identify anyone in the lineups. However, according to the detective, he became emotional and seemed on the verge of crying when he looked at the lineup containing defendant's photograph.

5

As mentioned, defendant's brother Benjamin was originally charged with attempted murder and shooting at an occupied motor vehicle. He testified in his own defense, denying he was involved in the shooting. According to Benjamin, he and defendant went to a party on West Silver Eagle Road, also in North Sacramento, but closer to the Norwood neighborhood. Around midnight, defendant left the party with an undisclosed friend. Benjamin stayed behind with one of his friends (who went by the nickname "Peewee") to steal cars from around the neighborhood and bring them back to the house. He did so to impress "some guys" at the party who were studying to become automotive technicians at a local technical institute. Other than four or five short trips to steal cars, Benjamin stayed at the party until around 4:00 a.m., at which point he left the party with Peewee. Benjamin denied seeing his brother, Clancy, Benavidez, or Chaveste during the early morning hours of January 24 and further denied being in Clancy's car. This portion of Benjamin's testimony was corroborated by evidence he wore an ankle monitor at the time of the shooting that did not register his presence at the crime scene. This testimony was also corroborated by stolen car reports.

During cross-examination, after a break in the proceedings, Benjamin stated he remembered defendant briefly coming back to the party with "a group of friends" around 2:00 a.m. According to Benjamin, there were "no females" in this group. Benjamin admitted calling defendant at 3:37 a.m., which was right around the time Lopez was shot. As he explained the reason for the call, someone had taken one of the cars he had previously stolen that night, and he called his brother to ask if someone in defendant's group had done so. Benjamin also admitted defendant called him a short time later, claiming defendant told him "not to go out because there was a lot of cops." Cell phone records confirmed these calls were made, and placed defendant's cell phone in the area of the shooting at 3:37 a.m. Benjamin testified defendant later admitted shooting a Norteño

after leaving the party. As he recalled the admission, "he told me he shot a buster up close." The word "buster" is a derogatory term used by Sureños to disrespect Norteños. This testimony was corroborated by a prior consistent statement Benjamin made the same day. In response to a text message from Peewee asking, "What did [defendant] say about yesterday," Benjamin responded: "He told me he [shot] a buster up close."

Thus, while Benjamin's testimony was inconsistent with that of Benavidez, at least as to his involvement in the shooting, it also served to corroborate her identification of defendant as the shooter by providing defendant's admission to "shoot[ing] a buster up close." However, Benavidez's testimony was also inconsistent with that of Chaveste, who denied seeing a shooting while in Clancy's car and further denied ever hanging out with both defendant and Benjamin at the same time. She did admit to being in a car with Clancy and defendant, and possibly other people, but testified this was "probably before January," although she denied remembering "anything about that day." She also admitted telling police in a March 2010 interview that the car ride happened "two months prior," which would place the ride in January; and while she denied witnessing a shooting during that interview as well, she told police defendant was carrying a black semi-automatic handgun in the car.

Based on the foregoing, defendant was convicted of attempted murder and shooting at an occupied motor vehicle, with various gang and firearm enhancement allegations found to be true.

### *The Second Shooting*

Juan Alvarado was also a member of the Norteño criminal street gang. On the morning of April 3, 2010, Alvarado was walking to his father's house in North Sacramento for breakfast. He had spent the previous night with his girlfriend at her house. His route took him north on Taft Street. After passing an elementary school, he

7

turned right onto his father's street, Berggren Way. As he did so, a group of Sureños approached in a car heading south on Taft. The car turned left on Berggren and stopped next to Alvarado. Defendant, seated in the front passenger seat, pulled out a handgun and fired three or four rounds, one of which hit Alvarado in the abdomen. The bullet passed through his liver and gallbladder, and lodged in one of his kidneys. Despite the gunshot wound, Alvarado managed to run to a nearby house, which was divided into a duplex, where he climbed over a fence enclosing one of the duplex's backyards. He then kicked his way through a fence dividing that backyard from the other duplex's backyard and knocked at that duplex's back door until the resident came out and called 911.

Narciso Guzman (who went by the nickname "Cube") was in the car at the time of the shooting. He testified the driver was Ramon Bravo (who went by the nickname "Charlie Brown"), defendant was seated in the front passenger seat, Wilberto Padilla (who went by the nickname "Willie") was seated in the back seat behind Bravo, and Guzman was seated in the back seat behind defendant. After picking up some beer at a liquor store, the group was heading south on Taft when Guzman saw a "random guy" walking up the street. Guzman did not "see no red on him," but believed him to be a Norteño because of the way Bravo immediately made a left turn to pull up next to him and the "dead silent" tension in the car. After a brief moment in which defendant and Guzman were "staring down" the man on the street, defendant pulled out a handgun and "started shooting." Defendant fired three or four rounds, during which, at least from Guzman's perspective, the man simply "disappeared." Bravo then made a u-turn and headed back the way they came. Around this time, defendant revealed: "I went to school with that dude."

Police responded to the backyard Alvarado broke into during his escape from the gunfire. He told one of the responding officers the car that pulled up was a gold

8

Oldsmobile. Bravo drove a white Oldsmobile Alero. Alvarado also told the officer there were five Sureños in the car, but he could not identify any of them. Later, after he was transported to the hospital, Alvarado provided a more detailed statement to a detective with the Sacramento Police Department, during which he stated he recognized the shooter because he "went to junior high" with either the shooter or the shooter's older brother, who had the nickname "Playboy or Grumpy." Alvarado suspected he was shot by the younger brother because he had previously been in a fight with the older brother. Alvarado later positively identified defendant in a photographic lineup, stating he was "almost positive" defendant was the person who shot him, but also informed the detective he would not "point the finger" at defendant in "open court."

True to his word, Alvarado did not identify defendant as the shooter at trial, claiming he did not remember who shot him. However, he did not recant his prior identification. When asked whether he identified defendant in the lineup because he believed defendant was the one who shot him, Alvarado answered: "Obviously, at the time, yeah, when I remembered." In response to the same question, worded slightly differently, Alvarado answered: "Obviously, obviously. Don't take a damn rocket scientist."

Based on the foregoing, defendant was convicted of attempted murder and shooting from a motor vehicle at another person outside that vehicle, with various gang and firearm enhancement allegations found to be true.

DISCUSSION

I

*Invocation of the Right to Remain Silent*

Defendant contends the trial court prejudicially erred and violated his federal constitutional rights by admitting into evidence statements defendant made to police after

9

he invoked his right to remain silent. We agree there was a *Miranda* violation, but conclude beyond a reasonable doubt the error in admitting post-invocation statements made by defendant was harmless.

## A.

### *Additional Background*

Four days after the second shooting, defendant was taken into custody and advised of his *Miranda* rights. Defendant indicated he understood these rights. He was then transported to the police station, where he was interviewed by Detective John Sample about 45 minutes after the advisement.

The interview began at 2:15 p.m. Detective Sample asked defendant about his family, gang affiliation, criminal record, and drug use. He then asked defendant for his cell phone number. Defendant said he did not remember the number and no longer had a cell phone because he left it in his pants when they were put in the washing machine. The detective also asked defendant about problems he was having with Norteños, leading defendant to reveal an incident in which shots were fired at his parents' house. The detective then said he was going to get his case file so they could discuss "some things that have been happenin[g]." Defendant asked: "When can I go home?" The detective answered: "We gotta finish, uh, havin our conversation. Okay?" Defendant asked: "Then I can go home?" The detective responded by asking whether defendant had "something goin on," to which defendant answered: "I want to go to sleep." The detective responded: "Well, you can catch up on your nap as soon as we're done. Since you don't have a job yet." After a brief conversation about where defendant had applied for work, the detective left the room to get his case file. He was out of the room for about 20 minutes, most of which defendant spent fidgeting, with periodic yawns, eye rubbing, and placing his head on the table.

10

The interview resumed at about 3:40 p.m. with Detective Sample challenging defendant's claim that his cell phone had been put through the wash. Defendant admitted he was lying about that and said he did so to find out whether the detective "would know if [he] was tellin the truth or not." The detective then asked defendant about various gang associates, including his brother Benjamin. At this point, about 15 minutes after the interview resumed, defendant asked: "Well, can we just stop and I can go home? Cause I ain't arrested." The detective answered: "We -- we gotta go through this whole thing." Defendant responded: "No, we don't." The detective then said, "I have to ask these questions, partner," to which defendant replied: "You have to, but I don't have to answer em cause I'm tired of all this. You already know who these people are." The questioning then shifted to girls who associated with defendant's subset of the Sureño gang, i.e., Howe Park, including Clancy and Chaveste. A short time later, the detective asked defendant when he was last with both Clancy and Chaveste. Defendant said he had not seen Clancy and Chaveste together since before January.

Detective Sample then turned his focus to the second shooting, asking defendant about the previous Friday night, which was the night before Alvarado was shot. Defendant claimed he went over to a girl's apartment for a "kick back" around midnight. He went to the apartment with four Sureño members or associates, who went by the nicknames Slowbrain, Smiley, Pirata, and Peewee. Clancy showed up sometime later and then left again with "a couple people" defendant did not know. Defendant stayed until around 8:00 a.m. Saturday and then walked to his cousin's apartment. Later in the day, Clancy stopped by the cousin's apartment and took defendant home. After extracting this information, the detective asked defendant about "the shooting." Defendant responded: "Oh, I heard about a shooting." He then explained he heard "a fuckin loud ass gunshot" when he was inside the girl's apartment; he did not know where

11

the shot came from, nor did he know what time it was when he heard the shot. Defendant's story about Clancy leaving the party then changed slightly. Instead of defendant not knowing who left with her, he now claimed it was Peewee and Smiley who did so. They left around 5:00 a.m. Pirata left the party much earlier. Defendant also added that Slowbrain accompanied him on his walk to his cousin's apartment at 8:00 a.m.

Later in the interview, Detective Sample began questioning defendant about the first shooting. Defendant said he did not "know about any shooting" and further denied Clancy or Chaveste ever saw him with a gun. He then claimed to have seen Chaveste on only two occasions, neither of which was in January. Defendant also denied possessing any guns at any time since January. He then asked when he would be able to leave. The detective answered: "I just got a couple more questions." A short time later, defendant asked to use the restroom, which he was allowed to do. The detective then left him alone in the interview room for another 23 minutes, during which defendant again alternated between fidgeting, yawning, rubbing his eyes, and putting his head down on the table. The interview resumed at about 5:45 p.m. A short time into the resumed interview, the detective asked whether defendant was near Kesner Avenue and Norwood Avenue on January 24. Defendant initially denied being in that area. He then said he was at a birthday party for a friend (who went by the nickname "Creeper") in that area, but did not remember the date of the party. When the detective confronted defendant with phone records placing his cell phone in the area, defendant responded: "We was over there by the party." According to defendant, he went to the party with Peewee and Peewee's brother (who went by the nickname "Flacco") and heard gunshots as they were leaving the party sometime after midnight. Defendant also claimed to have "seen a car take off" that he believed to be a small Honda, but did not remember the color "because it was nighttime."

12

Detective Sample then returned to the second shooting and told defendant to be honest about what happened. Defendant responded: "Just, uh, I don't know the driver, but I guess they were goin to someone's house to go pick some -- some shit up cause they want to smoke crystal and they were going to someone's house and the phones was there, so I gave em mine and shit. And then they took -- I heard -- they told me they took -- that they used a gun and shit, that they didn't tell me what -- um, what happened or anything." Defendant then clarified the "they" to whom he was referring were at his cousin's apartment when he and Slowbrain arrived that morning. According to defendant, after they left with his cell phone to "pick up crystal," they returned to the apartment and said they shot "some buster."

A short time later, Detective Sample told defendant he already knew the truth about both shootings because there was "lots of evidence left behind." He elaborated: "There's witnesses over here on [January] 24th at Norwood and Kesner, there's witnesses. There's physical evidence. There's a bullet at this house -- in -- I mean in this car. There's a bullet in this guy. And this guy lived. This Northerner, he lived. So I already talked [to] this guy and his homeys over on Kesner. In April, on April 3rd, over on Taft, over by that school, just down from that school over there, this Northerner, he lived too and he has good eyesight and a good memory. . . . I know for a fact that you have history with this guy that got shot over on Taft. I know for a fact you have history with him. I showed you his picture before, right? Where do you know him from? Cause I know." Defendant then admitted knowing Alvarado from school, but claimed he had not seen him in a long time.

At this point in the interview, roughly four hours after it began, several exchanges between defendant and Detective Sample form the basis of defendant's claim that he invoked his right to remain silent. The exchanges are the following.

13

"[Detective Sample]: My patience is gettin thinner and thinner down the road and there's only one truth that's gonna tell you what actually happened in this situation, okay? You got your house shot, right?

"[Defendant]: Yeah

"[Detective Sample]: I understand that 100-percent. Your mom and dad have been shot at by Northerners. I understand that 100-percent. I arrested that dude. Cause I don't want him to ever do that again. I need you to tell me what happened over on Taft cause I do not want the whole shit load of people to end up gettin in trouble for something. What happened?

"[Defendant]: I don't know.

"[Detective Sample]: You don't know.

"[Defendant]: *Just take my ass home*. I told you everything you wanted to hear.

"[Detective Sample]: No, I didn't hear anything that I wanted to hear so far. You've given me several different versions --

"[Defendant]: You asked me all your questions, *now take me home*.

"[Detective Sample]: I didn't ask -- ask you all my questions. Look at this folder right here, partner. [¶] . . . We're talking about one thing right now.

"[Defendant]: I'll be here for fuckin weeks for all that fuckin thing.

"[Detective Sample]: No, you're gonna tell me the truth and we'll be outta here.

"[Defendant]: Well, I could be outta here right now. I just need my phone.

"[Detective Sample]: You need to tell me the truth. Somebody picked you out.

"[Defendant]: Okay, like I said --

"[Detective Sample]: I know for a fact your phone was --

"[Defendant]: I -- I can walk outta here right now. I ain't arrested and detained.

"[Detective Sample]: You know, you -- you got some, uh, some nerve.

14

"[Defendant]:  Well, I'm just sayin. I --

"[Detective Sample]:  You got some nerve. You're --

"[Defendant]:  Gimme my phone."  (Italics added.)

As defendant demanded his phone, he reached across the table to take it, knocking some of Detective Sample's papers on the ground in the process.  He then picked the papers up as the detective told him, "don't be reachin across my table because you're a 17 year old" and "[y]ou know you're on probation, right?"  The interview resumed.

A short time later, the following exchange occurred.

"[Detective Sample]:  You wanna go home, right?

"[Defendant]:  Yeah.

"[Detective Sample]:  You want somethin, I want somethin.  I want the truth.  I want the truth of what happened out there and I know it's hard for you to tell me.

"[Defendant]:  I told you I don't wanna be no fuckin snitch.

"[Detective Sample]:  I'm not askin you to be a snitch.  I'm askin you to tell me what happened.  You need to explain to me how your cell phone magically appears right here.  And you didn't give your phone to nobody, partner.

"[Defendant]:  Okay.  *Just take me home*."  (Italics added.)

The interview continued.  Three questions later, in response to which defendant denied shooting anyone, he repeated:  "*So take me home*."  And again:  "*Just take me home*."  (Italics added.)  Then, three times, defendant told Detective Sample to call his parents to pick him up.  After the detective deflected each demand, defendant said:  "Let me see my phone.  I'll call em right now."  The detective responded:  "I already told you we'll take care of it.  I'm runnin this interview right now.  You're not."

A few questions later, the following exchange occurred:

"[Detective Sample]:  Well, what happened?

15

"[Defendant]:  I didn't shoot nobody *so just take me home*.

"[Detective Sample]:  Okay.  You were there.

"[Defendant]:  *I know my rights*.

"[Detective Sample]:  *I know your rights, too, partner*.

"[Defendant]:  *Okay*.  *So take me home, then*.

"[Detective Sample]:  We're not goin home.  We're talking right now."  (Italics added.)

At this point, defendant told Detective Sample they could "talk some other day," to which the detective responded, "You're gonna tell me today what happened and why you were out there," and reminded defendant he was on probation and needed to "walk a very thin line."  Two questions later, defendant repeated:  "*Take me home*." And again:  "*Just take me home*."  When Detective Sample responded, "I already heard that, partner," defendant said:  "Then why ain't you doin it?  *Call my parents*."  Two questions later, defendant again repeated:  "*Just take me home*."  And another time: "*Take me home*."  Defendant again asked the detective to call his parents.  When the detective said, "that'll happen later," defendant responded:  "*Just take me home then*." (Italics added.)  Detective Sample deflected this demand with:  "Do you understand what I'm talking about here?" and, "We're talking about an attempt murder charge. Do you think you're just gonna go home without answerin this question?  We're gonna talk about why somebody picked your photo outta being out at this scene where this guy got shot."

A short time later, defendant asked the detective:  "How long can you hold me here for?"  The detective answered:  "As long as I need to.  A detention can last 48 hours. I don't wanna wait 48 hours."  Three questions later, defendant said:  "*Just wait the 48 hours so I can go home*."  After asking the detective for the time, defendant said:  "*Let's*

16

*just start the wait then*." Three questions later, defendant repeated: "*Let's just wait the 48 hours so I can go home*." In response, the detective asked: "Why won't you just tell me what you were doin on Taft?" When defendant answered, "I ain't no snitch," the detective responded: "I didn't ask you to snitch anything. I didn't ask you to throw any names, nothing like that." The detective continued asking what defendant was doing on Taft, adding: "Just answer that. *You want this to be finished*. My last question, you answer it." Defendant responded: "And then I can -- *then it's done*." The detective answered: "Last question. Answer it." Defendant clarified: "*Then I go home*." When defendant did not answer the question to the detective's satisfaction, there was another question, prompting defendant to respond: "*Fuck it, man. Just take me home, fuck. Let's just wait the 48 hours so I can go home*." (Italics added.) In response to this—the thirteenth time defendant demanded to be taken home—the detective said he also wanted to leave. Defendant responded: "Then I -- if I answer this question, it's another one and another one, then another one." The detective promised: "That's the last question I will ask you. I just want you to tell me the truth." Defendant eventually answered that he left with the people who were at his cousin's apartment "to go fuckin get some crystal."

That was not Detective Sample's last question. During the remainder of the interview, defendant admitted to going to Bill's Liquor the morning of the second shooting, the same liquor store Guzman would later testify where he went with defendant, Bravo, and Padilla to buy beer before defendant shot Alvarado. According to defendant, however, he went to the liquor store with one of his cousin's friends (who went by "Charlie") and Charlie's friend (who went by the nickname "Rana"), whom they picked up before going to the liquor store. When they approached Alvarado on their way back from the liquor store, defendant recognized him, and realized Alvarado also recognized defendant. Then, someone in the car—defendant did not see who—fired

17

three shots, after which they made a u-turn and left the area. Defendant believed the shooter to be Rana. With respect to the first shooting, defendant claimed his brother Benjamin was also in the car with Peewee and Flacco when they heard gunshots. According to defendant, Peewee drove, Flacco was seated in the front passenger seat, and defendant and Benjamin were seated in the back seat. Defendant then acknowledged getting out of the car and going over to a man's car before the shooting. As he explained, the man appeared to be either drunk or dead, so he went over to investigate. When defendant got to the man's car, someone in Peewee's car asked whether he was "a buster" because "they were gonna call the ambulance" unless he was a Norteño, in which case they would "just leave him there." According to defendant, the man did not appear to be a gang member. At this point, defendant got back in Peewee's car, informed his companions of his observations, and they drove away. They heard the gunshots as they left. Defendant also claimed the car he saw take off after the shots were fired was "big" and "dark gray," contradicting the statement he made earlier in the interrogation that the car was small and he did not remember the color. The interview ended at 7:15 p.m., five hours after it began.

Prior to the start of the first trial, defense counsel requested a hearing under Evidence Code section 402 to determine the admissibility of defendant's statement to Detective Sample under *Miranda*. After hearing testimony from the detective who advised defendant of his *Miranda* rights prior to the interview, viewing the video and reading the transcript of the interview, and entertaining the arguments of counsel, the trial court ruled defendant validly waived his *Miranda* rights at the start of the interview and did not clearly and unequivocally invoke his right to remain silent at any point during the interview. With respect to invocation, the trial court found defendant's repeated demands to be taken home and for Detective Sample to call his parents so they could pick him up

18

to be "objectively ambiguous because they were limited to his concern of being labeled a snitch." The trial court further found there was no coercion by Detective Sample in his questioning of defendant.

**B.**

*Governing Law and Standard of Review*

"Under California law, issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards." (*People v. Nelson* (2012) 53 Cal.4th 367, 374 (*Nelson*).)

"The basic rule of [*Miranda*], and its progeny, is familiar: Under the Fifth Amendment to the federal Constitution, as applied to the states through the Fourteenth Amendment, '[n]o person . . . shall be compelled in any criminal case to be a witness against himself [or herself] . . . .' [Citation.] 'In order to combat [the] pressures [of custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his [or her] rights' to remain silent and to have the assistance of counsel. [Citation.] '[I]f the accused indicates *in any manner* that he [or she] wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him [or her] during interrogation thereafter may not be admitted against him [or her] at his [or her] trial' [citation], at least during the prosecution's case-in-chief [citations]." (*People v. Lessie* (2010) 47 Cal.4th 1152, 1162, italics added.) It is the prosecution's burden to prove, by a preponderance of the evidence, the accused's rights under *Miranda* were not violated. (*Lego v. Twomey* (1972) 404 U.S. 477, 489 [30 L.Ed.2d 618, 627]; *People v. Sapp* (2003) 31 Cal.4th 240, 267; *People v. Bradford* (1997) 14 Cal.4th 1005, 1033.)

Here, defendant does not dispute he was adequately and effectively apprised of his *Miranda* rights prior to the interrogation or challenge the trial court's ruling he validly

waived those rights by talking to Detective Sample. "The problem came," defendant argues, "when [he] attempted to assert those rights." Issues of post-waiver invocation are governed by *Davis v. United States* (1994) 512 U.S. 452 [129 L.Ed.2d 362] (*Davis*) and *Berghuis v. Thompkins* (2010) 560 U.S. 370 [176 L.Ed.2d 1098] (*Berghuis*).

*Davis*, *supra*, 512 U.S. 452, involved post-waiver invocation of the *Miranda* right to counsel. There, the United States Supreme Court explained: "If the suspect effectively waives his [or her] right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him [or her]. [Citation.] But if a suspect requests counsel at any time during the interview, he [or she] is not subject to further questioning until a lawyer has been made available or the suspect himself [or herself] reinitiates conversation. [Citation.]" (*Id*. at p. 458, citing *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378].) This rule, the court explained, is not itself compelled by the Constitution, but instead is a prophylactic measure "'designed to prevent police from badgering a defendant into waiving his [or her] previously asserted *Miranda* rights.'" (*Davis*, *supra*, 512 U.S. at p. 458, quoting *Michigan v. Harvey* (1990) 494 U.S. 344, 350 [115 L.Ed.2d 293].) With respect to what constitutes a request for counsel triggering the prophylactic rule of *Edwards*, the *Davis* court explained, "this is an objective inquiry," and held "the suspect . . . must articulate his [or her] desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Davis*, *supra*, 512 U.S. at p. 459.) Conversely, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." (*Ibid*.) The court further "decline[d] to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an

20

unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him [or her]." (*Id*. at pp. 461–462.)

In *Berghuis*, *supra*, 560 U.S. 370, the United States Supreme Court held the *Davis* standard for determining whether a suspect has invoked his or her *Miranda* right to counsel also applies to determining whether a suspect has invoked the related right to remain silent, explaining "there is no principled reason to adopt different standards" for the two inquiries. (*Id*. at p. 381.) Rather, the court found "good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously," explaining: "A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity. [Citation.] If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.' [Citation.] Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity. [Citations.]" (*Id*. at pp. 381-382.) Applying the *Davis* standard to the facts of the case, the court held the defendant, who was "'[l]argely' silent" during the roughly three-hour interrogation (*id*. at p. 375), did not unambiguously invoke his right to remain silent, explaining: "Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his "'right to cut off questioning."'" (*Id*. at p. 382, citing *Michigan v. Mosley* (1975) 423 U.S. 96, 103 [46 L.Ed.2d 313] (*Mosley*).)

The California Supreme Court has held the same objective standard for determining whether an adult suspect has invoked his or her *Miranda* rights also applies

to juvenile suspects. (*Nelson*, *supra*, 53 Cal.4th at pp. 378-380.) Thus, "once a juvenile suspect has made a valid waiver of the *Miranda* rights, any subsequent assertion of the right to counsel or right to silence during questioning must be articulated sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be an invocation of such rights." (*Id*. at pp. 379-380.)

"In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith* (2007) 40 Cal.4th 483, 502.) Here, resolution of defendant's *Miranda* claim does not turn on disputed facts resolved by the trial court. The interrogation was videotaped. We have reviewed the video. There is no factual dispute over what questions were asked by Detective Sample, what answers were given by defendant, whether defendant demanded to be taken home and have his parents called to pick him up, how many times he made these demands, or the context in which they were made. Thus, we must independently determine whether a reasonable police officer in Detective Sample's position would have understood defendant's repeated demands to be taken home and to have his parents called to pick him up to be an unequivocal and unambiguous assertion of his right to refuse to answer further questions.

## C.

### *Defendant Invoked His Right to Remain Silent*

We conclude defendant invoked his right to remain silent. In *Mosley*, *supra*, 423 U.S. 96, the United States Supreme Court explained the *Miranda* right of silence is a "'right to cut off questioning.' [Citation.] Through the exercise of [this] option to terminate questioning, [the suspect] can control the time at which questioning occurs, the

22

subjects discussed, and the duration of the interrogation.  The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting." (*Mosley* at pp. 103-104.)  In *Berghuis*, *supra*, 560 U.S. 370, as mentioned, the United States Supreme Court provided two examples of "simple, unambiguous statements" sufficient to invoke this right, i.e., "[I] want[] to remain silent" and "[I do] not want to talk." (*Id*. at p. 382.)

In *People v. Martinez* (2010) 47 Cal.4th 911 (*Martinez*), the California Supreme Court held the statement, "'That's all I can tell you'" (*id*. at p. 949) was not an unambiguous statement invoking that defendant's right to terminate questioning. (*Id*. at p. 946.)  Relying on *In re Joe R*. (1980) 27 Cal.3d 496, in which the court concluded, based on the context of that interrogation, that the "defendant's use of the phrase 'That's all I have to say' was not an attempt to end the interrogation and that '[i]t was not unreasonable for the [trial] court to endorse the prosecutor's inference that what [the] defendant was saying was, That's my story, and I'll stick with it,'" the court in *Martinez* explained:  "In the present case, we agree with the trial court's conclusion, supported by [the interrogating officer's] testimony, that he believed [the] defendant was telling him '[t]hat's all the information he had for me.'" (*Martinez*, *supra*, 47 Cal.4th at pp. 949-950.)  Thus, statements that can be reasonably construed to mean, "That's my story and I'm sticking to it" or "I don't know what else to tell you" are not unambiguous statements a reasonable officer would know to be an invocation of a defendant's right to end the interrogation.

Similarly, in *People v. Williams* (2010) 49 Cal.4th 405 (*Williams*), our Supreme Court viewed the defendant's statement, "'I don't want to talk about it,'" in context and concluded it was not "an unambiguous invocation of the right to remain silent," citing a number of cases standing for the proposition that "'[a] defendant has not invoked his or

her right to silence when the defendant's statements were merely expressions of passing frustration or animosity toward the officers, or amounted only to a refusal to discuss a particular subject covered by the questioning.'" (*Id.* at pp. 433-434, quoting *People v. Rundle* (2008) 43 Cal.4th 76, 115, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see also *People v. Thomas* (2012) 211 Cal.App.4th 987, 1006 [viewed in the context of a number of "expressions of frustration," the defendant's single statement, "'I ain't talking no more and we can leave it at that,'" could be viewed as "another expression of momentary frustration and, at most, was an ambiguous invocation of the right to remain silent"].)

*People v. Jennings* (1988) 46 Cal.3d 963 (*Jennings*) is another case in which context made the difference between invocation and non-invocation. There, the suspect said to one of three interrogating officers: "'I'll tell you something right now. You're scaring the living shit out of me. I'm not going to talk. You have got the shit scared out of me,' and 'I'm not saying shit to you no more, man. You, nothing personal man, but I don't like you. You're scaring the living shit out of me. . . . That's it. I shut up.'" (*Id.* at p. 977.) Our Supreme Court held these statements, viewed in context, did not amount to an unambiguous invocation of the right to end the interrogation, explaining: "Were we to base our decision solely on the reporter's transcript of those portions of the interview on which appellant relies, his claim that he invoked his right to silence would appear meritorious. On a review of the full tape and consideration in context of the words on which defendant relies a different picture emerges. That part of the first interview at which defendant claims he asserted his rights involved a few moments when defendant lost his temper and expressed anger toward Officer Cromwell who was then questioning him about his whereabouts on the Monday following the murder." (*Id.* at p. 978.) The court noted, however, that another officer, Officer Maich, whom the defendant "had

24

earlier indicated that he trusted [and] whom he had known for many years," was also present at the time; a third officer, Officer Rose, "for whom [the defendant] had been a narcotics informant," was also involved in the interrogation, although apparently not present at the time the purported invocation occurred. (*Ibid*.) The court concluded: "When defendant made the statements he claims were an invocation of his rights *he was addressing Cromwell*. Viewing the tape, observing defendant's demeanor before, during, and after the statements, and considering the context in which defendant made the statements on which he relies here, we conclude that the statements reflect only momentary frustration and animosity *toward Cromwell*." (*Id*. at pp. 978-979, italics added.) Therefore, the trial court reasonably concluded the "defendant was refusing to talk further *with Cromwell* whom he did not like or trust, as opposed to Maich or Rose, and that he was not invoking his right against self-incrimination when he made these statements." (*Id*. at p. 979, italics added.) The court further noted the trial court ruled the defendant successfully invoked his right to end the interrogation the following day when he said to Officer Maich, "I don't want to talk no more." (*Id*. at p. 977, fn. 5.)

Based on the foregoing authorities, the Attorney General frames the issue as whether "[a] reasonable officer in the circumstances could view [defendant's repeated demands to be taken home and to have his parents called to pick him up] as expressions of frustration with Detective Sample's refusal to believe [defendant] did not have anything to do with the two shootings." This is not the test. Whether defendant was frustrated with Detective Sample or not, if he unambiguously demanded that the interrogation end, the detective was required to end the interrogation. The point of the above-described cases is that a seemingly unambiguous statement may be ambiguous when viewed in context, particularly where the interrogating officer could reasonably construe the statement as one of *passing* or *momentary* frustration, or simply a denial of

guilt, rather than a demand to end the interrogation. Thus, the question we must answer is whether defendant's repeated demands to be taken home and to have his parents called to pick him up, viewed together and in context, amount to an unambiguous assertion of the right to end the interrogation, or whether a reasonable officer in the circumstances could construe them to be expressions of passing or momentary frustration, or a short-hand way of indicating defendant was sticking to his story.

In answering this question, we find *Christopher v. Florida* (11th Cir. 1987) 824 F.2d 836 (*Christopher*) to be instructive.[2] There, the defendant stated during his interrogation: " '*Then I got nothing else to say. If you're accusing me of murder, then take me down there*.' " The latter sentence was an apparent reference to being taken to jail. After one of the interrogating officers reminded the defendant, "'I told you awhile ago you were being charged with both murders,'" the defendant stated: " 'Okay then. *I got nothing else to say*.' " At this point, a second officer asked: " 'You mean it's all right as long as we accuse you of one?' " The first officer then added: " 'But all of a sudden when you're accused of two, you don't—' " The defendant interrupted with, " 'I'm not saying that' " and acknowledged he knew he was being accused of two murders, to which the second officer responded: " 'Yeah. You—you should know.' " The defendant then said: " 'Okay then. *What's the need of me saying anything then*.' " The officers continued the interrogation. (*Christopher*, *supra*, 824 F.2d at p. 840.) The United States Court of Appeals for the Eleventh Circuit held "there can be no doubt that the officers violated [the defendant's] right to cut off questioning" by continuing the interrogation "despite [his] repeated invocations of his right of silence." (*Id*. at pp. 840-

---

[2]     While "we are not bound by the decisions of the lower federal courts even on federal questions[,] . . . they are persuasive and entitled to great weight." (*People v. Bradley* (1969) 1 Cal.3d 80, 86.)

26

841.) After declining to determine whether, as Florida argued, the defendant's first assertion of his right to end the interrogation was equivocal because it was conditioned on whether or not the officers were accusing him of murder (*id*. at p. 841 and fn. 14), the court held the defendant's subsequent statement, " 'Okay then. I got nothing else to say[,]' . . . considered in the totality of the circumstances, cannot be viewed as anything other than an unequivocal invocation of his right to remain silent." (*Id*. at p. 842.) The court also rejected Florida's argument there was no clear invocation of the right to end the interrogation because the defendant continued to answer questions, explaining: "[A] suspect's claim that the police violated his [or her] right to silence by failing to immediately terminate the interrogation is not negated by the fact that the suspect answered additional questions after the police failed to scrupulously honor his [or her] request to end the questioning. [Citations.] '[A]n accused's *post-request* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself.'" (*Id*. at p. 841, quoting *Smith v. Illinois* (1984) 469 U.S. 91, 100 [83 L.Ed.2d 488].)

Here, defendant told Detective Sample to take him home 13 times within a matter of 14 minutes. During this short span of time, he also tried to take his cell phone from the detective to call his parents to pick him up. When this did not work, he repeatedly told the detective to call his parents. At one point, defendant even tied his demands to be taken home and to have his parents called to his "rights," saying, "I know my rights," prompting the detective to respond, "I know your rights, too, partner," and to which defendant replied: "So take me home then." The only right defendant could possibly have been referring to is his right to end the interrogation. Also within this 14-minute span of time, defendant asked how long he could be held without charges being filed and then asked—three times—to wait out the 48 hours so he could then go home. We

27

conclude a reasonable officer in Detective Sample's position would have understood defendant's repeated demands to be taken home, to have his parents called to pick him up, and to wait out the 48 hours, to be an unambiguous invocation of his right to end the interrogation. Indeed, the detective acknowledged as much when he said—after defendant's twelfth demand to be taken home: "*You want this to be finished*. My last question, you answer it." Defendant responded: "And then I can -- then *it's done*" and, "Then *I go home*." (Italics added.) This exchange makes crystal clear Detective Sample knew what defendant meant by "take me home." He meant to invoke his right to end the interrogation. While we also acknowledge the standard is not what defendant actually meant, or even what the detective actually understood him to mean, but what "'a reasonable police officer in the circumstances would understand the statement'" to mean (*Nelson*, *supra*, 53 Cal.4th at p. 376; *id*. at p. 378), any reasonable officer faced with so many demands to be taken home by a juvenile suspect, in such a short period of time, and coupled with defendant's other demands, would have understood defendant to be invoking his right to end the interrogation.

Nor can defendant's repeated demands be construed as "'expressions of passing frustration'" (*Williams*, *supra*, 49 Cal.4th at p. 433) or indications he was sticking to his story (see *Martinez*, *supra*, 47 Cal.4th at pp. 949-950), rather than demands to end the interrogation. Having reviewed the video of defendant's interrogation, we conclude his demeanor changed dramatically when confronted with the evidence against him. This change was not one of momentary frustration or impatience with a detective who did not believe his version of events. Instead, defendant's demeanor became that of a young man who had decided to end the interrogation. As in *Christopher*, *supra*, 824 F.2d 836, where that defendant's second statement, " 'Okay then. I got nothing else to say,' " qualified as an unequivocal invocation of the right to end the interrogation, we conclude that at least

28

by defendant's third demand to be taken home, "Okay. Just take me home," a reasonable officer would have understood defendant to be demanding the same thing. At that point, Detective Sample should have scrupulously honored defendant's invocation of his right to end the interrogation. However, when the detective did not do so, defendant repeated this demand *10 more times*. Because the interrogation continued despite defendant's repeated unambiguous demands for it to end, his *Miranda* right to cut off questioning was violated.

Nevertheless, relying primarily on *Moore v. Dugger* (11th Cir. 1988) 856 F.2d 129 (*Moore*) and *Mueller v. Angelone* (4th Cir. 1999) 181 F.3d 557, the Attorney General asserts defendant did not unambiguously invoke his right to end the interrogation. Such reliance is misplaced. In *Moore*, the same federal circuit court that decided *Christopher*, *supra*, 824 F.2d 836 held the following question, asked by the defendant during interrogation, did not clearly and unambiguously invoke his right to cut off questioning: "'When will you all let me go home?'" (*Moore*, *supra*, 856 F.2d at p. 134, fn. 1.) Distinguishing this question from the statements made by the defendant in *Christopher*, the court explained: "We are not persuaded that this statement evidences a refusal to talk further. This request for information about when, in the future, [the defendant] would be allowed to leave differs markedly from the statements in *Christopher* which we held were attempts to cut off questioning, but which were not honored by police." (*Moore* at p. 134.) Here, toward the start of the interrogation, defendant asked Detective Sample: "When can I go home?" However, there is no claim this question was an assertion of defendant's right to end the interrogation. *Moore* simply does not address whether a juvenile defendant's subsequent and repeated *demands* to be taken home are analogous to the statements at issue in *Christopher*. As we have explained, we conclude they are.

29

In *Mueller*, *supra*, 181 F.3d 557, the defendant claimed "he repeatedly invoked his right to remain silent . . . by demanding that he be taken to jail." (*Id*. at p. 575.) The United States Court of Appeals for the Fourth Circuit agreed with the Virginia Supreme Court's conclusion the defendant's demands "were 'simply impatient gestures and that they did not constitute an invocation of his right to terminate the interrogation.'" (*Id*. at pp. 575-576, quoting *Mueller v. Commonwealth* (1992) 422 S.E.2d 380, 387, overruled on another ground in *Morrisette v. Warden of Sussex I State Prison* (2005) 613 S.E.2d 551, 562.) Summarizing the state court's reasoning, the Fourth Circuit explained the defendant "continued to talk to the investigators after each such statement; when asked whether he would rather talk to other officers [the defendant] replied, 'I've been talking to you guys for four months. I've established a pretty good relationship with you guys;' he had demonstrated on two previous occasions with these same officers that he clearly knew how to stop an interrogation when he so desired." (*Mueller*, *supra*, 181 F.3d at p. 576.) Neither the Fourth Circuit's opinion, nor the state court's opinion reveals how many times the defendant demanded to be taken to jail, or what his demeanor was when he made the demands.

Here, we have 13 demands to be taken home during the span of 14 minutes, one of which was tied to defendant's "rights." As we have explained, by the third such demand—and certainly by the thirteenth—no reasonable officer would have believed them to be "'simply impatient gestures.'" (*Mueller*, *supra*, 181 F.3d at p. 576.) We also know nothing about the demeanor of the defendant in *Mueller*. As previously explained, having reviewed the video of defendant's interrogation, we conclude his demeanor was not that of impatience or passing frustration, but rather determination to end the interrogation. Also unlike *Mueller*, there is no evidence in this case that defendant, on a previous occasion, more clearly stated a desire to end an interrogation. Finally, unlike

30

the Fourth Circuit, we do not consider the fact defendant continued answering questions between his 13 demands to be taken home, or that he continued to do so after it became clear Detective Sample was refusing to end the interrogation. "[A]n accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." (*Smith v. Illinois*, *supra*, 469 U.S. at p. 100; *Christopher*, *supra*, 824 F.2d at p. 841.)

Nor are we persuaded by the Attorney General's reliance on our Supreme Court's decision in *Nelson*, *supra*, 53 Cal.4th 367. There, about three and a half hours into an interrogation, after the interrogating officers asked the juvenile defendant if he wanted to take a polygraph test, the defendant asked to call his mother "to 'let her know what's happening' and also to 'talk to her about it' and 'see what [he] should do.' . . . He also made additional requests to call his mother and was permitted several times to try to reach her." (*Id*. at pp. 372-373.) After holding the same standard applicable to an adult defendant's assertion of *Miranda* rights also applies to a juvenile defendant's assertion of those rights (*Nelson* at pp. 378-380), the court concluded a reasonable officer in the circumstances would not have viewed any of the defendant's requests to call his mother as an unambiguous assertion of the right to counsel or the right to end the interrogation. (*Id*. at p. 382.) The court explained, "when asked the reason for the call, [the defendant] offered no indication that he wanted an attorney or that he did not want to talk further. Instead, he specifically stated he wanted to let his mother 'know what's happening' and to ask her what he should do because he was being accused of murder." (*Ibid*.) The court also concluded a subsequent statement made by the defendant, i.e., that "he wanted the investigators to leave him alone because . . . they were 'getting on [him] for something [he] didn't do'" (*id*. at p. 373), was not an unambiguous assertion of the right to end the interrogation, explaining: "A reasonable officer in the circumstances could

31

view that statement as an expression of frustration with the investigators' repeated refusal to accept his denial of guilt for the murder." (*Id*. at p. 383, citing *Williams*, *supra*, 49 Cal.4th at p. 433 and *Jennings*, *supra*, 46 Cal.3d at pp. 977-978.)

Here, defendant did not ask to call his parents to let them know what was going on. Instead, he specifically told Detective Sample to call his parents so they could pick him up and take him home. Thus, defendant's demands to have his parents called are properly viewed as further demands to be taken home, which we have already concluded a reasonable officer would have understood to be an unambiguous demand to end the interrogation. Moreover, unlike the single "'leave me alone'" statement at issue in *Nelson* (*id*. at p. 383), here, defendant made over a dozen demands to be taken home. No reasonable police officer would have viewed so many demands to be taken home as "'merely expressions of passing frustration or animosity.'" (*Williams*, *supra*, 49 Cal.4th at p. 433.)

For the foregoing reasons, we conclude defendant's *Miranda* right to end the interrogation was violated in this case.

## D.

### *Prejudice*

We turn now to the question of prejudice. The erroneous admission of statements obtained in violation of *Miranda* is reviewed for prejudice pursuant to *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705], under which we inquire whether the error may be deemed harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310 [113 L.Ed.2d 302]; *People v. Cunningham* (2001) 25 Cal.4th 926, 994.) Under this standard, the evidence that remains after defendant's post-invocation statements are excluded must not only be sufficient to support the verdict, but

32

must overwhelmingly establish his or her guilt beyond a reasonable doubt.  (*Christopher*, *supra*, 824 F.2d at p. 846.)  The evidence in this case satisfies this high standard.

With respect to the first shooting, Benavidez, who was in the car when defendant got out, walked over to Lopez's car, and shot the intoxicated man twice at close range, identified defendant as the shooter in court.  Her testimony that defendant lifted up the man's shirt and said, "He's a Norteño," before firing two rounds into the man was corroborated both by the medical evidence Lopez was shot twice, once in the neck and once in the shoulder, and by Lopez's statement at the hospital that he was a Norteño and he was wearing a red belt at the time he was shot.  While her testimony with respect to who else was in the car, specifically defendant's brother Benjamin and Chaveste, was disputed by testimony from these witnesses and by evidence Benjamin's ankle monitor did not register his presence at the crime scene, Benjamin provided highly incriminating evidence against his brother, i.e., defendant's confession to having "shot a buster up close" the night Lopez was shot.  Thus, while Benjamin denied being in the car at the time of the shooting, his testimony corroborated Benavidez's identification of defendant as the shooter by providing defendant's own admission to "sh[ooting] a buster" that night.  Cell phone records also confirmed defendant's presence in the area of the shooting at the time Lopez was shot.  We also note that while Lopez did not identify defendant as the shooter, he became noticeably emotional when shown a photographic lineup containing defendant's picture.

With respect to the second shooting, the evidence was even stronger.  Alvarado, a Norteño with whom defendant had problems in the past, identified defendant as the shooter when shown a photographic lineup at the hospital.  While he claimed at trial not to remember who shot him, he previously warned police he would not "point the finger" in "open court" and admitted he previously identified defendant because he believed

33

defendant was the one who shot him. Moreover, Guzman, who was in the car at the time of the shooting, did identify defendant as the shooter at trial.

Defendant also made incriminating statements prior to his invocation. He admitted to being a Sureño gang member, his parents were shot at by Norteños, he got into fights with Norteños while incarcerated, and his house had recently been shot at. While defendant claimed not to know who shot at the house, a reasonable inference is that defendant at least suspected the rival gang was involved. These circumstances provided defendant with a powerful motive to retaliate against Norteños. Defendant also told Detective Sample he had his cell phone on him the morning of the second shooting and he and the phone never left his cousin's apartment, so there would be no reason the phone would have pinged a cell tower near the scene of the shooting. Later, also before defendant invoked his right to end the interrogation, he said he did not have his phone on him the whole morning. Instead, defendant claimed he gave his phone to someone he did not know, who was also at his cousin's apartment. That person, according to defendant, left in a car with others to pick up methamphetamine and returned a short time later. Defendant claimed someone in the group admitted "they used a gun" and "got some buster" while they were out. Defendant further admitted to knowing the second victim from school despite the fact he previously denied knowing him. These lies were highly incriminating.

Setting aside the statements obtained in violation of *Miranda*, "overwhelming" is an apt descriptor for the remaining evidence establishing defendant's guilt for the crimes charged and enhancements alleged with respect to each shooting. Moreover, while "*confessions* carry 'extreme probative weight,' [and] the admission of an unlawfully obtained *confession* rarely is 'harmless error'" (*Christopher*, *supra*, 824 F.2d at p. 846, italics added), here, defendant did not confess to either shooting. He made

34

inconsistent statements, and placed himself at or near the scenes of the crimes yet steadfastly denied his involvement. Without minimizing the damaging nature of the statements defendant made after he invoked his right of silence, they would not have carried the extreme probative weight of a confession.[3] We therefore conclude the erroneous admission of statements obtained in violation of *Miranda* was harmless beyond a reasonable doubt.

---

[3]    Nor are we persuaded by defendant's argument the jury in the second trial deliberated over the span of four days and indicated they could not reach a unanimous verdict. The record reveals the jury retired to the deliberation room shortly before the lunch break on the first day of deliberations and heard playback of the victim's interview at the hospital during the afternoon. On the morning of the second day, the jury heard readback of the victim's cross-examination. That afternoon, the jury heard playback of defendant's interview with Detective Sample. That timeline does not leave much time for actual deliberating during these two days. On the morning of the third day of deliberations, the jury asked to review certain evidence and then asked the trial court what the process was if they could not reach a unanimous verdict. The trial court instructed the jury with CALCRIM No. 3551 and sent them back to the deliberation room. After lunch, the jury asked the trial court to clarify the intent required for the firearm enhancements, which the trial court did. They returned a unanimous verdict the following day. This is not a case, like *People v. McDonald* (1984) 37 Cal.3d 351, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, in which the evidence supporting the defendant's guilt and that supporting his alibi defense was "close," and where the jury deliberated for "a total of 19 and a half hours over a period of 6 days," amounting to "more than three and a half times longer than it took to put on the entire prosecution and defense case." (*Id.* at p. 376 & fn. 23.) Here, evidence of defendant's guilt was overwhelming. The length of the deliberations indicates the jury took their job very seriously and spent considerable time reviewing the evidence, but does not necessarily indicate they found the case to be close. Nor does the jury's question regarding the process to be followed *if* they could not reach a unanimous verdict. Based on overwhelming evidence of guilt, the jury found defendant to be guilty beyond a reasonable doubt. We conclude, by the same standard, the jury would have so found even without the improper admission of defendant's post-invocation statements.

## II

### *Coercion*

In a related argument, defendant claims Detective Sample's refusal to honor his assertion of the right to remain silent amounted to coercion and rendered the remainder of his statements involuntary. We disagree.

"A criminal conviction may not be founded upon an involuntary confession." (*Williams*, *supra*, 49 Cal.4th at p. 436.) "A confession is involuntary if it is 'not "'the product of a rational intellect and a free will'"' [citation], such that the defendant's 'will was overborne at the time he [or she] confessed.' [Citation.] In assessing allegedly coercive police tactics, '[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' [Citation.] Whether a statement is voluntary depends upon the totality of the circumstances surrounding the interrogation. [Citation.]" (*People v. Smith, supra,* 40 Cal.4th at p. 501.) "Relevant considerations are '"the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health."' [Citation.]" (*Williams*, *supra*, 49 Cal.4th at p. 436.)

Here, reviewing the totality of the circumstances of the interrogation, we conclude defendant's will was not overborne by the continued questioning following his invocation of the right to end the interrogation. We first note that, aside from the *Miranda* violation, defendant does not assert any of Detective Sample's actions were coercive in any way. Assuming, without deciding, that a *Miranda* violation alone may rise to the level of "coercive police tactics" in an appropriate case, in this case, the violation was not "'so coercive [as to] produce a statement that is both involuntary and unreliable.'" (*People v.*

36

*Smith*, *supra*, 40 Cal.4th at p. 501.) Despite defendant's young age, he "had experience in the criminal justice system," and despite evidence he was tired, he nevertheless "effectively parried [Detective Sample's] accusations and questions" throughout the interrogation. (*Williams*, *supra*, 49 Cal.4th at p. 442.) Moreover, while the detective was able to elicit some incriminating responses, i.e., admissions to being present during each shooting, defendant never confessed to being the shooter, but instead "continued to deny responsibility in the face of the [detective's] assertions." (*Id.* at p. 444.) These are not the actions of someone whose will has been overborne.

In any event, we have already concluded the trial court should have excluded statements made after defendant invoked his right to end the interrogation. Even if we were to conclude the same statements should have been excluded for the separate reason that they were involuntarily made, the standard of prejudice is the same. (See *People v. Cahill* (1993) 5 Cal.4th 478, 509-510.) Thus, for the reasons already expressed, we would conclude the error was harmless beyond a reasonable doubt.

## III

### *Denial of Defendant's Request for Removal of a Prisoner*

Defendant further asserts the trial court prejudicially erred and violated his state and federal constitutional rights by denying his request for the trial court to issue a removal order for Wilberto Padilla, who was confined in a state prison outside Sacramento County, and thereby preventing defendant from calling Padilla as a defense witness in the second trial. Not so.

### A.

### *Additional Background*

On April 26, 2012, during the second trial, defendant filed an ex parte request for the trial court to issue a removal order for Padilla on the grounds he was "a necessary and

37

material witness" in the case. Attached to the request was a declaration from defendant's attorney, which asserted Padilla's testimony was necessary and material for the following reasons:

"a. At this stage in the evidence, [Alvarado] has testified that on April 3, 2010, [defendant] was in the front passenger seat of a vehicle near Taft and Berggren Way in Sacramento County. [Defendant] shot a firearm at, and hit, [Alvarado]. [Alvarado] has testified he knows [defendant] from school and he knows [defendant's] brother, Benjamin . . . .

"b. [Alvarado] was cross-examined as to his credibility and counsel believes that [Alvarado's] credibility has been sufficiently attacked to create a reasonable doubt in the mind of the jurors. However, another witness, [Guzman], has presented a different attack relating to his credibility.

"c. [Guzman] has testified that on April [3, 2010], he was in the back passenger seat of a vehicle driven by [Bravo]. Further, that [defendant] was in the front passenger seat when [defendant] pointed a gun at [Alvarado] (referred to as 'the Northerner' during direct examination) and shot him with a small caliber firearm.

"d. [Padilla] would be expected to testify that he was sitting in the back seat on the passenger side and that [defendant] was also seated in the back seat of the car.

"e. If it can be suggested that [Guzman] was actually seated in the front passenger seat and that was the area from which the shot came from, then this jury may not find true the Penal Code section 12022.53 enhancement or that he is not guilty of a violation of Penal Code section 664/187(a), attempted murder."

The trial court denied the request the same day, explaining it "would need something more than just that person -- the attorney saying what they are hoping the person might say."

38

On April 30, 2012, defendant filed a "supplement" to the request for the removal order, attaching a police report summarizing Padilla's statement to detectives. From photographs, Padilla identified defendant as "Lalo," someone he had known since middle school. He also identified Bravo and Guzman as people he knew from "hanging out" around Howe Avenue, but claimed he did not know their names. When shown a surveillance video taken at Bill's Liquor the morning of the shooting, Padilla identified himself walking into the store with Bravo. He stated Bravo, Guzman, and defendant picked him up at 7:10 a.m. near Howe Avenue and El Camino Avenue. According to Padilla, he was sitting in the back seat with defendant. He did not remember who was driving "because [he] was tired." They then "went over to [defendant's cousin's] house for a little while," after which, they went to the liquor store and then took Padilla home. When asked, "what happened that day," Padilla stated he wanted to talk to his attorney and the interrogation ended.

The same day, the trial court treated the supplement to the initial ex parte request for the removal order as a supplemental ex parte request for removal and denied that request as well, explaining nothing in the supplement "chang[ed] the Court's analysis."

## B.

### Analysis

Penal Code section 2621 provides in relevant part: "When the testimony of a material witness is required in a criminal action, before any court in this state, . . . and such witness is a prisoner in a state prison, an order for the prisoner's temporary removal from such prison, and for the prisoner's production before such court, . . . may be made by the superior court of the county in which such action . . . is pending or by a judge thereof; *but in case the prison is out of the county in which the application is made*, such

39

order shall be made *only upon the affidavit of the district attorney or of the defendant or the defendant's counsel, showing that the testimony is material and necessary*; and *even then the granting of the order shall be in the discretion of said superior court or a judge thereof.*"[4]  (Italics added.)

Under this provision, "an accused has a right to have a witness brought from a state prison outside the county, provided a showing is made by affidavit to the satisfaction of the court that the prisoner is a material and necessary witness; it rests within the discretion of the court to determine whether the showing of materiality and necessity is sufficient."  (*People v. Davenport* (1962) 210 Cal.App.2d 335, 339 (*Davenport*), disapproved on another point in *People v. Hall* (1980) 28 Cal.3d 143, 156, fn. 8.)[5]

Vesting such discretion in the trial court does not violate Article I, section 15, of the California Constitution, which guarantees a defendant in a criminal case the right "to compel attendance of witnesses on the defendant's behalf."  (See *People v. Putman* (1900) 129 Cal. 258, 261; *Davenport*, *supra*, 210 Cal.App.2d at p. 339.)  Nor does it violate the federal Constitution's guarantee that a defendant in a criminal case has the right "to have compulsory process for obtaining witnesses in his [or her] favor" (U.S. Const., 6th Amend.), and which "is incorporated in the Due Process Clause of the Fourteenth Amendment" (*Washington v. Texas* (1967) 388 U.S. 14, 17-18 [18 L.Ed.2d 1019]).  (See *United States v. Wilson* (5th Cir. 1984) 732 F.2d 404, 412 [the matter is addressed to the trial court's discretion].)

---

[4]    Undesignated statutory references are to the Penal Code.

[5]    In turn, *People v. Newman* (1999) 21 Cal.4th 413, at page 422, footnote 6, disavowed certain dictum contained in *People v. Hall*, *supra*, 28 Cal.3d 143, which was also unrelated to section 2621.

In *Davenport*, *supra*, 210 Cal.App.2d 335, the Court of Appeal held the trial court did not abuse its discretion in denying a request to remove a prisoner under section 2621 where the defendant stated the prisoner he sought to have produced (Luna) was " 'aware of the particulars leading up to and culminating in [the defendant's] arrest' " for possession of a firearm by a convicted felon, was " 'an eye witness,'" and would "'give testimony on behalf of [the defendant].' " (*Id*. at p. 339.)  The court explained:  "There was an insufficient showing that the testimony that Luna might give would be material or necessary to the defense.  There was no showing that there were any facts to be testified to by Luna which would have aided the defense, nor a statement of any fact that would be testified to by defendant or his witnesses to which Luna also could or would testify.  Although it was represented that Luna 'was aware of the particulars' and was 'an eye witness,' there was no statement that he would testify that [the defendant] did not have in his possession a deadly weapon as charged in the information.  [¶]  The facts of the present case well illustrate the necessity for a satisfactory showing for the production of a witness from a state prison.  If Luna had been produced and had corroborated the testimony of [the defendant] and [that of another eye witness, who each testified the defendant had possession of the firearm, although they also noted he protested when given the gun], it would only have added to the evidence of defendant's guilt.  The court did not err in denying defendant's motion."  (*Id*. at pp. 339-340.)

Here, as in *Davenport*, the trial court did not abuse its discretion in determining defendant's showing of necessity and materiality was lacking.  While the declaration of defendant's trial counsel stated Padilla would be expected to testify defendant was seated in the back seat, thereby contradicting testimony from Alvarado and Guzman that defendant was seated in the front passenger seat when he fired at Alvarado, this expectation was based exclusively on Padilla's brief statement to police, in which he

41

described the positions of the car's occupants *at 7:10 a.m. when he was picked up* near Howe Avenue and El Camino Avenue. However, according to Padilla's statement, they then "went over to [defendant's cousin's] house for a little while," after which, they went to the liquor store and then took Padilla home. The interrogation then ended due to Padilla invoking his right to counsel. Alvarado was shot sometime after they left the liquor store. Padilla's statement reveals nothing about their positions in the car *at that time*. Thus, defendant's trial counsel had no basis to assert Padilla would testify defendant was seated in the back seat at the time of the shooting. Indeed, similar to the situation in *Davenport*, if Padilla had been produced and had corroborated the testimony of Guzman with respect to the occupants' positions in the car *at the time of the shooting*, "it would only have added to the evidence of defendant's guilt." (*Davenport*, *supra*, 210 Cal.App.2d at p. 340.) We similarly conclude the trial court in this case did not abuse its discretion in denying defendant's request to remove Padilla from prison under section 2621.

## IV

### *Sufficiency of the Evidence*

We also reject defendant's claim the evidence was insufficient to support his convictions. Indeed, our conclusion the *Miranda* violation was harmless beyond a reasonable doubt based on the strength of the remaining evidence against defendant compels the further conclusion such evidence was sufficient to support his convictions and the enhancement findings. (See *Christopher*, *supra*, 824 F.2d at p. 846 [to hold *Miranda* violation harmless beyond a reasonable doubt, the evidence that remains after the defendant's post-invocation statements are excluded must not only be sufficient to support the verdict, but must overwhelmingly establish his or her guilt beyond a reasonable doubt].)

42

# V

## *Correction of the Abstract of Judgment*

Finally, defendant seeks correction of a clerical error in the abstract of judgment. The abstract of judgment describes Counts One and Four as, "Attempted murder, second degree." However, as defendant points out, and as the Attorney General properly concedes, the crime of attempted murder is not divided into degrees. (*People v. Favor* (2012) 54 Cal.4th 868, 876; *People v. Douglas* (1990) 220 Cal.App.3d 544, 549.) Accordingly, we order the abstract of judgment corrected to describe these counts as "attempted murder."

## DISPOSITION

The judgment is affirmed. The trial court is directed to prepare a corrected abstract of judgment deleting the description of Counts One and Four as "attempted murder, second degree," and replacing that description with "attempted murder." The trial court is further directed to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

HOCH, J.

We concur:

MURRAY, Acting P. J.

DUARTE, J.

43