Filed 2/26/24  P. v. Hammond CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DARNELL JAMES HAMMOND,<br><br>    Defendant and Appellant. | F083530<br><br>(Kern Super. Ct. No. BF165964A)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br><br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the opinion filed herein on February 1, 2024, be modified as follows:

1.    On page 6, the first paragraph is deleted.  Deletion of this paragraph will require renumbering of all subsequent footnotes.

2.    On page 6, the second full paragraph, beginning "Surveillance footage showed" is deleted and the following paragraph is inserted in its place:

Surveillance footage then showed a Saturn Ion[1] stop in front of the Quality Gas market front door, facing north towards Panama

---

[1] It was stipulated by both the prosecution and defense "the tan Saturn Ion and the black Nissan Altima ... are believed to be the vehicles used in the commission of the crimes ... on October 14th, 2016," and "[t]he black Nissan Altima belongs to Jim Thomas Langston's girlfriend," and that Langston's "DNA was not located in the tan Saturn Ion, but it was located near the seat belt locking mechanism in the black Nissan Altima.  It is unknown when Mr. Langston's DNA was transferred to the black Nissan Altima."

Street, with three masked men exiting and entering the store. One suspect was armed with a Mac-11 assault pistol, wearing a black glove and a white glove, and black and white Nike shoes. Defendant was armed with a black nine-millimeter handgun and wore white gloves, white Nike shoes, and a "New York Yankees" beanie. Givan, the third heavy-set suspect, was not armed. Langston remained in the Saturn throughout the extent of the robbery and ensuing homicides.

3.    On page 6, the third full paragraph, beginning "Upon entering the market," is deleted and the following paragraph is inserted in its place:

> Upon entering the market, defendant and Givan headed to the back of the counter where Juan was located, and the other suspect pointed his firearm at Heriberto, who was standing in front of the counter, and demanded money. During this exchange, Heriberto pulled out a handgun, but was shot by the other suspect. Heriberto fell to the ground and was also shot by defendant. Defendant then turned towards Juan, who was on the floor behind the counter, and shot him as well.[2] Rigoberto fell to the ground and stayed there until the men left.

4.    On page 7, the first full paragraph is deleted and the following paragraph is inserted in its place:

> The other suspect then ran out of the store and got into the Saturn, which sped off. Defendant and Givan then left on foot. However, defendant returned to pick up cash trays from inside the market. Moments later, defendant exited the market and was seen by witnesses running away from Quality Gas, armed with a pistol, and carrying two cash trays. He was left behind.

5.    On page 7, delete the second full paragraph.

6.    On page 8, line 6, the word "Hammond" is replaced with "defendant" so the sentence reads:

> Fidel later identified defendant as the individual in his yard in a six-pack lineup.

---

[2]    Defendant, the suspect with the two white gloves, wore a dark facemask with a small design near his chin, dark Nike brand shoes with a white logo, and a black sweatshirt with a white undershirt.

Except for the modifications set forth herein, the opinion previously filed remains unchanged.  The modifications do not alter the judgment.  Defendant's petition for rehearing is denied.


                                                                    FRANSON, J.
WE CONCUR:


DETJEN, Acting P. J.


SMITH, J.

Filed 2/1/24  P. v. Hammond CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DARNELL JAMES HAMMOND,<br><br>Defendant and Appellant. | F083530<br><br>(Super. Ct. No. BF165964A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent

-ooOoo-

**INTRODUCTION**

On September 21, 2021, a jury convicted defendant Darnell James Hammond of the premeditated first degree murders of Heriberto Aceves and Juan Aceves (Pen. Code,

§§ 187, subd. (a), 189, counts 1 & 2),[1] and found true all enhancements and allegations.[2] Subsequently, defendant was sentenced to two indeterminate terms of life without the possibility of parole, plus 50 years to life, and a determinate term of 10 years.

On appeal, defendant contends: (1) the trial court committed reversible error when it admitted statements to Detective Anderson after he unequivocally invoked his right to remain silent pursuant to *Miranda*,[3] during both his first and second interrogations; and (2) he is entitled to the benefit of newly enacted Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333), which amended the language of section 186.22, and added section 1109 requiring bifurcation of the trial of gang enhancements and substantive gang offenses from that of the underlying offenses upon a defendant's request. Specifically, defendant argues the changes made by Assembly Bill 333 require dismissal of both his gang enhancements (§ 186.22, subd. (b)(1)) and the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)). The People concede the amendments to section 186.22 apply retroactively and that the gang enhancements (§ 186.22, subd. (b)(1)) must be dismissed, but argue the changes made by newly enacted section 1109 do not apply retroactively. Regardless, the People contend defendant is not entitled to reversal of his convictions because he was not prejudiced by the trial court's failure to bifurcate the gang enhancements. The People further contend the changes made by Assembly Bill 333 do not apply to the gang-murder special circumstance (§ 190.2, subd. (a)(22)), because any change would constitute an unconstitutional amendment to Proposition 21. During the pendency of this appeal, our Supreme Court held that "Assembly Bill 333's definition of 'criminal street gang' to the gang-murder special circumstance *does not*

---

[1]    All further references are to the Penal Code, unless otherwise stated.

[2]    As we discuss further below, defendant was also convicted and sentenced to additional offenses and enhancements.

[3]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2.

unconstitutionally amend section 190.2(a)(22)." (*People v. Rojas* (2023) 15 Cal.5th 561, 580, italics added (*Rojas*).)

Lastly, in supplemental briefing, defendant contends this case should be remanded to allow for him to make a record at a *Franklin*[4] hearing, even though he was sentenced to two indeterminate terms of life without the possibility of parole, and the abstract of judgment must be amended to strike the section 1202.45 parole revocation fine.

We accept the People's concession, vacate the sentence, and remand for resentencing. Further, based on *Rojas*, we conclude the entirety of Assembly Bill 333 applies retroactively to defendant's case and, as to all offenses, reverse the section 186.22, subdivision (b)(1) enhancements, and as to counts 1 and 2, reverse the gang-murder special circumstance allegations pursuant to section 190.2, subdivision (a)(22). On remand, the People are not foreclosed from retrying defendant on both the gang enhancements and the gang-murder special circumstance allegations, and the trial court can address the *Franklin* issues. The other claims lack merit. In all other respects, we affirm the judgment.

## STATEMENT OF CASE

On August 9, 2021, the Kern County District Attorney filed a first amended information charging defendant with two counts of premeditated first degree murder (§§ 187, subd. (a), 189, count 1 (Heriberto) & count 2 (Juan)) with the special circumstances he committed multiple murders (§ 190.2, subd. (a)(3)), he was engaged in the commission or attempted commission of a robbery and burglary (§ 190.2, subd. (a)(17)(A) & (G)), and that he was an active participant in a criminal street gang and the murder was committed in furtherance of the gang (§ 190.2, subd. (a)(22)); two counts of robbery (§ 212.5, subd. (c), counts 3 & 4); active participation in a gang (§ 186.22, subd. (a), count 5); possession of a firearm by a felon (§ 29800, subd (a)(1), count 6); and

---

[4] *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

3.

unlawfully carrying a loaded firearm, to wit, a handgun in public (§ 25850, subd. (c)(3), count 8). As to counts 1, 2, 3, 4, and 6, the information further alleged both a gang (§ 186.22, subd. (b)(1)) and firearm enhancement (§§ 12022.53, subd. (d), 12022.5, subd. (a)). Finally, as to all offenses, the first amended information alleged a prior strike offense for attempted robbery (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d), 211, 664) and a prior serious felony offense (§ 667, subd. (a)).[5]

On September 21, 2021, a jury convicted defendant on all remaining counts and found true all remaining enhancements and allegations. As to the alleged prior strike and serious felony offense, the trial court in a bifurcated trial found true that defendant suffered a prior conviction for a violation of section 211/664, as alleged in the information. On October 7, 2021, a jury in the penalty phase of the trial sentenced defendant to life without the possibility of parole.

Subsequently, as to count 1, the trial court sentenced defendant to an indeterminate term of life without the possibility of parole, plus consecutive terms of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)), and five years for the prior serious felony offense (§ 667, subd. (a)), plus a 10-year term for the gang enhancement (§ 186.22, subd. (b)(1)), but stayed the 10-year term pursuant to section 654. As to count 2, the trial court sentenced defendant to an indeterminate term of life without the possibility of parole, plus consecutive terms of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)), and five years for the prior serious felony offense (§ 667, subd. (a)), to be served consecutive to count 1, plus a 10-year term for the gang enhancement (§ 186.22, subd. (b)), but stayed this 10-year term pursuant to section 654. As to count 3, the trial court imposed the upper term of five years, doubled to 10 years

---

[5] Prior to the jury trial, the People dismissed both count 5 (§ 186.22, subd. (a)) and count 8 (§ 25850, subd. (c)(3)) in the furtherance of justice. Further, as to count 6, the People dismissed the firearm enhancement (§ 12022.5, subd. (a)) for insufficient evidence.

because of the prior strike, plus 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)) and 10 years for the gang enhancement (§ 186.22, subd. (b)(1)), but stayed this sentence pursuant to section 654. As to count 4, the trial court imposed the upper term of five years, doubled to 10 years because of the prior strike, plus 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)) and 10 years for the gang enhancement (§ 186.22, subd. (b)(1)), but stayed this sentence pursuant to section 654. As to count 6, the trial court sentenced defendant to the upper term of three years, doubled to six years because of the prior strike, plus four years for the gang enhancement (§ 186.22, subd. (b)(1)), but stayed this sentence pursuant to section 654. The trial court also imposed a parole revocation fine of $300 pursuant to section 1202.45, but suspended the fine pending successful completion of parole.

## SUMMARY OF FACTS

I. *The Prosecution Case-in-Chief*

Heriberto and his two sons Juan and Jesus ran the Quality Gas, gas station and market, on the southwest corner of Main Street[6] and Panama Road in Lamont, southwest of Bakersfield. Rigoberto,[7] a friend of Jesus, also worked at Quality Gas.

A. *The Robbery/Murders and Subsequent Getaway*[8]

On Friday morning, October 14, 2016, at approximately 9:30 a.m., codefendant Langston entered the Quality Gas market, and was observed on surveillance footage cashing his payroll check and then leaving. Langston wore a black hat with a white cursive "W."

---

[6] Main Street is also referred to as Weedpatch Highway.

[7] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

[8] The underlying facts of the robbery and murders are from both testimony and surveillance footage admitted during the trial.

Shortly after leaving the store, Langston saw a dark colored Saturn Ion with three occupants following him and he eventually stopped. They asked if he would drive them to Quality Gas in exchange for $200. The three individuals were later identified as defendant Hammond, "Tiny," and "Baby Goo."[9] Langston later told officers the three individuals threatened him and were armed. He admitted he was asked to "[b]asically" be their getaway driver. He agreed to drive the three to Quality Gas. Langston also told officers he left his Nissan parked on Collision Avenue, about four blocks north of Quality Gas, and drove the three suspects in the Saturn Ion[10] to Quality Gas.

Surveillance footage showed the Saturn stop in front of the Quality Gas market front door, facing north towards Panama Street, with three masked men exiting and entering the store. The suspect referred to as "Tiny" was armed with a Mac-11 assault pistol, wearing a black glove and a white glove, and black and white Nike shoes. Hammond was armed with a black nine-millimeter handgun and wore white gloves, white Nike shoes, and a "New York Yankees" beanie. Givan, the third suspect, was not armed. Langston remained in the Saturn throughout the extent of the robbery and ensuing homicides.

Upon entering the market, Hammond and Givan headed to the back of the counter where Juan was located, and Tiny pointed his firearm at Heriberto, who was standing in front of the counter, and demanded money. During this exchange, Heriberto pulled out a handgun, but was shot by Tiny. Heriberto fell to the ground and was also shot by

---

**9** Detective Richard Anderson testified "Baby Goo" or "Big Dirt" was Myron Givan. Law enforcement believed Givan was the heavy-set suspect seen in the surveillance footage. We will refer to "Baby Goo" as Givan throughout this opinion.

**10** It was stipulated by both the prosecution and defense "the tan Saturn Ion and the black Nissan Altima ... are believed to be the vehicles used in the commission of the crimes ... on October 14th, 2016," and "[t]he black Nissan Altima belongs to Jim Thomas Langston's girlfriend," and that Langston's "DNA was not located in the tan Saturn Ion, but it was located near the seat belt locking mechanism in the black Nissan Altima. It is unknown when Mr. Langston's DNA was transferred to the black Nissan Altima."

Hammond. Hammond then turned towards Juan, who was on the floor behind the counter, and shot him as well.[11] Rigoberto fell to the ground and stayed there until the men left.

Tiny then ran out of the store and got into the Saturn, which sped off. Hammond and Givan then left on foot. However, Hammond returned to pick up cash trays from inside the market. Langston eventually picked up Givan and drove him and Tiny to Collision Street to switch cars.

Moments later, Hammond exited the market and was seen by witnesses running away from Quality Gas, armed with a pistol, and carrying two cash trays. He was left behind.

During this incident, Jose N. and Modesto N. were stopped at a red light at the corner of Main Street and Panama Road when they heard gunshots coming from the convenience store. Jose told Modesto he "heard gunshots, and he was like, 'I did too.' [They] glanced everywhere to see where it was and [they] couldn't see until [they] s[aw] the people coming out of the store." Two or three people exited the convenience store and Jose observed one individual "running on Panama." Jose called 911 and followed the individual who ran "eastbound on Panama and northbound on Carnation [¶] … [a]nd then turned left on Lana Street." The individual wore a black hoodie sweatshirt and "had a gun on his [¶] [l]eft hand" and a cash register "in the other hand." Jose then observed the individual take off his black hoodie sweatshirt and "thr[o]w it in the yard" of the house at "the corner of Carnation and Lana Street."

Fidel C. lived at a residence on Panama Road in Lamont. On the morning of the robbery, Fidel observed an African-American man trying to hide in middle of his front yard. The man wore "all black ... a black hoodie and a white tank top." "[H]e was, like,

---

**11** Hammond, the suspect with the two white gloves, wore a dark facemask with a small design near his chin, dark Nike brand shoes with a white logo, and a black sweatshirt with a white undershirt.

scared or trying to hide, trying to get away." "He [then] just walked around the yard, and then he got in one of the cars that were parked out front" — a black Lexus. Fidel's stepfather then came out and told the man to leave. The man wanted Fidel to hide him, "but [he] told him [he] couldn't." Subsequently, the man "took of his sweater and he threw it on the ground and he left[,]" but eventually came back and took the sweater with him. The man then ran eastbound. Fidel later identified Hammond as the individual in his yard in a six-pack lineup.

### B. Police Investigation

Law enforcement personnel arrived on scene shortly after the shootings and found "several subjects were pointing eastbound down Panama Road yelling, 'He's going that way.'" Deputies began searching the area for the suspects and were notified by a resident at a Lana Street address "that they had seen or saw a subject running into that yard." Deputies arrived at the residence and located a shed next to a detached garage. Defendant was found hiding inside the shed "squatting on his hands and knees." He was arrested. He was unarmed, wore a white tank top with dark colored pants, and was not wearing shoes. However, deputies located a pair of Nike shoes next to defendant.[12] Further, deputies located over a thousand dollars "in a rolled up mesh – piece of mesh" inside the shed. One of the $100 bills had either "a blood stain or a blood drop."[13]

Deputies also searched the inside of the market and located both Heriberto and Juan's bodies.[14] Further, deputies found a payroll check made payable to codefendant Langston for $137, and two pistols. The first pistol, a nine-millimeter caliber semi-

---

[12] Lieutenant Richard Anderson testified the suspect in the surveillance with the white gloves and handgun was the only suspect wearing the Nike shoes seized next to defendant.

[13] Criminalist G. Sugimoto analyzed the blood and testified that it was highly probable the DNA found on the bill belonged to Juan Aceves.

[14] Both Heriberto and Juan died from multiple gunshot wounds.

automatic SIG Sauer, was found next to Heriberto's body. It was believed this nine-millimeter pistol was the firearm use by Heriberto to defend himself. The second pistol, a .25-caliber Beretta handgun, was located in a holster inside an office next to the checkout area. Deputies also located three spent bullets and 17 shell casings from the scene.[15] Behind the store, deputies located a dark blue beanie with a New York Yankees' logo.[16]

Deputies also searched the surrounding area and located two white gloves, one of which had a cash tray discarded next to it. The gloves were stained and spotted with blood; the blood contained Juan Aceves's DNA. Further, both gloves were tested for DNA, and it was highly probable the gloves contained defendant's DNA.[17]

### C. Defendant's First Interview[18]

Around midnight of defendant's arrest, Detective Richard Anderson and Detective Tommy Robins interviewed defendant in custody at the sheriff's department. Detective

---

[15] Firearms Analyst C. Snow analyzed the three bullets and testified "they shared similar class characteristics but [he] could not ID them as being fired by the same firearm or by the firearm that [he] received." Further, as to the shell casings, he "found all of those shell casings to be inconclusive[;] [he] didn't have enough individual characteristics to be able to ID them."

[16] Criminalist B. Ramirez tested the beanie for DNA and it contained as least three contributors, but defendant "could not be excluded as a potential contributor to the DNA profile." She testified Langston, Myron Gibbons, Heriberto, and Juan were excluded as a potential contributor, and calculated that "a match between this item and [defendant] is ... 12 trillion times more likely for the African-American population."

[17] The first glove revealed "at least four people contributing their DNA" and defendant "could not be excluded as a potential contributor to the DNA profile." Specifically, it was 230 trillion times more likely defendant's profile matched the sample than some random person in the African-American population. As to the second glove, there were four different contributors, but defendant's DNA could not be excluded. Specifically, it was 1.5 billion times more likely defendant's profile matched the sample than some random person in the African-American population.

[18] We provide a more exhaustive description surrounding these two interviews in our discussion regarding the alleged *Miranda* violations.

Anderson read defendant his *Miranda* rights; defendant acknowledged he understood these rights.

Throughout the interview, defendant denied being involved in the robbery and instead claimed he consumed drugs, and that everything was just a "blur" that day. Although he admitted he was a member of the Country Boy Crips (CBC) gang, he denied being with any of his gang associates the day of the robbery. At the conclusion of the interview, Detective Robins collected defendant's buccal swab.

### D. Defendant's Second Interview

Approximately 36 hours later, Detective Anderson interviewed defendant a second time at the jail. Defendant again indicated he understood his *Miranda* rights. Defendant admitted the group's goal was to steal money from the convenience store, but maintained, "I'm no killer." He did not plan to shoot anyone "[b]ut the two started shooting at [him]." Defendant then shot back by firing "anywhere."

### E. Gang Evidence

Both parties stipulated to the following:

"The [CBC] are a criminal street gang as defined by Penal Code [s]ection 186.22.

"On May 24th, 2012, an incident occurred that led to [defendant] getting convicted of Penal Code [s]ections 25400(c)(6), which is the unlawful possession of a firearm as a felony. And [section] 186.22(a), active participation in a criminal street gang as a misdemeanor.

"On November 7th of 2014, an incident occurred that led to [defendant] getting convicted of Penal Code [s]ection 29800(a)(1), felon in possession of a firearm as felony. And Penal Code [s]ection 186.22(a), active participation in a criminal street gang as a misdemeanor."

#### 1. Prior Contacts

On May 24, 2012, Officer Brian Holcombe of the Bakersfield Police Department (BPD) was patrolling a CBC area when he contacted defendant. Defendant stated "[h]e was aware of where he was, as far as being in the traditional boundaries of the [CBC] and

that there were people present that were associated with that gang." Defendant was arrested earlier that evening for possession of a firearm "which [officers] had seen him discard earlier that evening."

In December 2014, BPD Sergeant Chad Garrett contacted defendant while they were responding to a call for service. Sergeant Garrett observed "numerous tattoos," specifically, "tattoos of deceased notable members of the [CBC]" and "a large 'T' and a 'B' which stood for his known moniker of Teeter Bob, among others."

### 2. Gang Expert Testimony

BPD Lieutenant Nathan McCauley testified as an expert in the CBC gang. He testified the CBC's primary activities are "[s]hooting, homicides, narcotic sales, auto theft, burglaries, [and] witness intimidation." McCauley knew defendant and testified defendant's tattoos established his loyalty to the CBC gang. He opined defendant "was an active member of the [CBC]" gang "based ... on his history of involvement in gang related crimes, admissions to being a gang member, tattoos on his person, and contacts with other gang members." Lastly, McCauley opined the underlying crimes were "done as a combination of in association with, the benefit of, and at the direction of the [CBC] criminal street gang."

## II. Defense Case-in-Chief

Defendant testified in his defense. He testified he intended to commit a robbery, but stated he did not want anyone to get hurt. Defendant also testified he admitted he was inside the convenience store because he "went by everything [that Detective Anderson] said" because the officer would not have believed him if he had told "the truth." Overall, defendant testified Detective Anderson scared him during the second interview, which resulted in him admitting things that were not true.

11.

Trial counsel also called Brian Leslie who was "an expert in coercive interrogation." Leslie reviewed the interviews and testified the detectives used coercive techniques against defendant.

**DISCUSSION**

I.   DEFENDANT DID NOT UNEQUIVOCALLY INVOKE HIS *MIRANDA* RIGHT TO REMAIN SILENT.

Before trial, defendant moved to exclude his two statements pursuant to *Miranda*. Defendant contends the trial court committed reversible error when it admitted his statements to Detective Anderson, after he unequivocally invoked his right to remain silent pursuant to *Miranda*. Specifically, defendant argues that his first interview his statements, "Are we done?" constituted an invocation of his right to remain silent. Additionally, as to his second interview, defendant argues he unequivocally invoked his right to remain silent on three separate occasions by telling Detective Anderson, "I can't talk right now." As to both claims, we disagree.[19] At the Evidence Code section 402 hearing, the trial court reviewed the recordings of the two hearings.

*A.     First Interview*

As noted above, defendant was read his *Miranda* rights and stated he understood his rights. During the interview, defendant repeatedly denied his involvement in the underlying crimes. After several minutes, defendant asked Detective Anderson, "Are we done?" Anderson responded by continuing to question defendant and defendant then asked two more times, "Are we done?" Anderson pushed back until defendant asked a

---

[19]    At the outset, both parties agree defendant validly waived his *Miranda* rights at the beginning of the first interview, however there is dispute as to whether Detective Anderson was required to readvise defendant of his *Miranda* rights before initiating the second interview. (See *People v. Ramirez* (2022) 13 Cal.5th 997, 1106–1107 (*Ramirez*), citing to *People v. Mickle* (1991) 54 Cal.3d 140, 170–171.) As we discuss in detail below, Detective Anderson was not required to provide defendant with a readvisement of his *Miranda* rights before initiating the second interview at the jail.

fourth time, "Are we done?" Anderson responded, "Uh, that's up to you. Are we done?" and defendant replied, "Yeah." At this point, the interview ended.

## B. Second Interview

Defendant was interviewed a second time approximately 36 hours later and nodded his head in affirmation he understood his *Miranda* rights.[20] Detective Anderson repeatedly asked defendant, "What happened?" and defendant continued to reply, "I'm no killer. I'm no killer." Anderson told defendant, "This is your only time that you're gonna be able to help yourself" and defendant replied, "I can't talk right now, sir. I can't talk right now."

Detective Anderson continued to question defendant. Eventually, the following relevant exchange occurred:

> "[DETECTIVE ANDERSON]:    I'm giving you an opportunity to tell the truth and do the right thing, [defendant]. It's up to you to take it. Not up to me. I can't – I can't force you. It's up to you, [defendant].
>
> "[DEFENDANT]:    (Unintelligible) I can't talk right now. My head hurts. My hair itches."[21]

Defendant then admitted to being in the convenience store at the time of the robbery. Specifically, defendant explained, "We just trying to go in get some money[,]" "[b]ut the two started shooting at [him]." He continued by stating the individual "was trying to grab the gun[,]" [¶] "[a]nd he shot. I didn't even mean to shot — I just (unintelligible) I just shot anywhere." At the end of the interview, defendant stated he would "rather talk to a

---

[20]    Specifically, in the audio file, Detective Anderson is heard asking defendant, "You understand your *Miranda* rights I read to you at the substation, right? At the headquarters? Is that a yes? You're nodding your head yes?"

[21]    Although People's Exhibit 6A indicates that defendant said, "That's — my air hurts, sir," it is clear in the recording (People's Exhibit No. 111) defendant told Detective Anderson, "My head hurts. My hair itches."

lawyer[,]" and Detective Anderson replied, "Okay ... You're free to go back, man." The interview ended.

### C. The Evidence Code Section 402 Hearing

Both the prosecutor and trial counsel called witnesses at the evidentiary hearing.

#### 1. Detective Richard Anderson's Testimony

Detective Anderson, who is six feet, four inches tall and weighs 300 pounds, testified for the People. He testified he was trained to stop an interview if the suspect clearly invoked his right to remain silent or obtain representation. However, he was also trained to continue interrogating the suspect, even after a suspect invokes their right to remain silent, so that their statements can be used for impeachment in the event the suspect testifies in their own defense.

Anderson first interviewed defendant around 11:00 p.m. or midnight on the same day as the shooting. During this interview, Anderson informed defendant he was under arrest and advised him of his *Miranda* rights; defendant acknowledged he understood his rights. During that first interview, defendant continued to deny involvement in the robbery and Anderson testified he ended the interview because "talking to [defendant] any further would have been pointless" and he "didn't see that pushing him would be fruitful."

Two days later, Detective Anderson interviewed defendant a second time. Anderson testified he continued to question defendant after he said, "I can't talk to you right now. I can't talk to you right now" because he did not understand these statements as a clear invocation to remain silent. He did admit that during this interview he slammed his hand down on the table and began "yelling" at defendant causing defendant to cry.

#### 2. Dr. Kimberly Fenn's Testimony

Dr. Kimberly Fenn testified for the defense as an expert on sleep deprivation's effects on memory and cognitive function. She is a psychology professor at Michigan

14.

State University, and before testifying she reviewed other expert reports and listened to the recordings of both interviews.

Dr. Fenn testified a lack of sleep reduces an individual's inhibitions, and according to studies the brain tends to over-emphasize rewards, which leads to riskier decisions. Further, she testified a lack of sleep can distort memories and the ability to retrieve or recall them. In experimental settings, "after sleep deprivation individuals are four times more likely to falsely confess to an act they did not commit than if they had slept the night before." Dr. Fenn opined defendant was sleep deprived during his first interview.

### 3. Brian Leslie's Testimony

Brian Leslie, a former police officer and consultant, testified for the defense as an expert on interrogation techniques. He reviewed audio and video from both interviews and opined that Detective Anderson used both "minimization" and "maximization" techniques, which could be coercive.

### 4. Supplemental Briefing

Defense counsel filed a supplemental brief where he argued defendant had unambiguously invoked his right to silence multiple times during the first interview when he asked Detective Anderson, "Are we done?" Further, he argued Anderson "reasonably believe[ed]" defendant had unequivocally invoked his right to remain silent because the detective ended the interview after he clarified defendant was "done speaking with the officer."

As to the second interview, defense counsel, citing *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*), argued this prior invocation was still effective because he did not reinitiate contact with the police. Further, counsel stated the interview improperly continued because defendant told Detective Anderson three times, "I can't talk right now," which constituted an unequivocal invocation to remain silent.

The prosecutor responded that defendant validly waived his *Miranda* rights and the statement, "We're done" was not a clear invocation to remain silent. Further, the

prosecutor argued *Edwards* only applies to situations where a suspect unambiguously invokes the right to counsel. Lastly, the prosecutor argued a reasonable officer would not have understood defendant's statements, "I can't talk right now" as unambiguous assertions of his right to remain silent.

5. *The Trial Court's Ruling*

After hearing additional argument, the trial court concluded that defendant's statements, "Are we done?" made during the first interview were not clear invocations of the right to remain silent. Specifically, the trial court stated the following:

"The first issue on [defendant] -- I'm going to take them sequentially – is whether or not [defendant] entered a knowing and voluntary waiver to the rights that were given to him in his first interview. I think the knowing and voluntary waiver comes in in two forms. One is the fatigue issue that was brought up through expert witnesses. And second, whether or not there was an audible response on the waiver that was given -- that was recited to him. Whether he affirmatively responded that he understood one of the particular advisals. [¶] ... [¶]

"The next question we address is whether or not the defendant invoked at the end of his rights -- end of the questioning. That is, in -- he asked the question to the detective. I believe it was Anderson. Are we done? To me that is clearly not an affirmative assertion or desire to end the interview and not a clear invocation of his rights to end the interview. And based upon the tone of the question and the circumstances of the questioning, where there was really no new information being offered to the questions of law enforcement and the context of the conversation, I think it was an expression of frustration by the defendant, if anything, that, you know, this is sort of pointless. It wasn't saying, I'm done.

"The response by Detective Anderson was interesting because it did essentially in a disbelieving approach summarize the story the defendant -- the statements that the defendant had given with the sort of impression that, you expect me to believe this, what you've told me? And the detective then went on to say, you know, are we done? Do you expect me to believe this? You tell me are we done. And at that point the defendant said, we're done.

"Do I see this as a clear invocation of assertion of rights? No. I think it has reached a loggerhead in the interview and the interview essentially came by mutual agreement to termination.

16.

"But I certainly see the point the defense has argued in this, that when you have the repetition in this way and the defendant eventually saying, yeah, we're done, that that's an assertion of his rights. But in the overall context of how this interview played out, again, I side with Detective Anderson's interpretation of it.

"The next step that we have is the re-interview being proper regardless of the invocation of the defendant. The Court does wish to comment a little bit about the defendant's sophistication and understanding of criminal processes.

"We know that based upon his statements in the initial interview he was recently released from parole within a few months time. He has a significant criminal history that I think has been covered in other motions that we have addressed. And obviously has some contact -- significant contact with law enforcement, as well as, to me, apparent gang identification. If by no other means, then -- while we haven't heard a gang expert on it, his tattoos and previous contact with law enforcement, as well as his probationary status not to have gang contact. That's a common term and condition of parole -- or probation. I would assume parole as well on a gang -- a case involving a gang allegation conviction.

"The defendant in the first interview, one argument is that he was fatigued and tired and not fully competent. The other one is that he was very relaxed in his interview. Did not appear to be overly stressed. And obviously, I think, was well aware of his rights and not intimidated by the situation or by the detective. And 33 hours, I think we have by mutual understanding, was passed, though there was some testimony it was the next afternoon and maybe 11 or 12 hours later, but I think everyone agrees factually that it was a longer period of time. If there is a dispute on that, I would invite some further information to clarify that. But I do think that's a significant point."

As to the second interview, the trial court concluded defendant's statements, "I can't talk right now" was not an invocation of his right to remain silent. Specifically, the trial court stated the following:

"The detective confirmed that he remembered his *Miranda* rights. And I would just comment societally, *Miranda* rights are somewhat engrained into society. I can't -- the number of times I've heard someone accused of a crime comment, I wasn't read my rights, who was not a criminal. In other words, someone that got stopped for driving under the influence or driving on a suspended license and was complaining to me in

17.

some fashion whether as a judge or as an attorney, that the cops never gave me my rights.

"So I think it's appropriate for the Court to note that in our modern society, we even have a verb now that didn't exist before, *Mirandized*, regarding the advisal of *Miranda*, which part of American slang.

"With that, the termination of the second interview, the statement by [defendant], I can't talk right now. I believe [trial counsel] accurately summed up the context of the statement by [defendant]. That is, I can't talk right now. My head hurts and my hair itches. But again, to me, this is not a clear invocation. It's a statement of a physical condition which indicates that he is not in a position to talk. But again, it's not an invocation. And while making this, he continued to engage in conversation with the officers. As such, I do find that statement is admissible."

*D.     Applicable Law*

The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.) To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the "inherently compelling pressures" of the custodial setting (*Miranda*, *supra*, 384 U.S. at p. 467), the high court adopted a set of prophylactic measures requiring law enforcement officers to advise a suspect of his right to remain silent and to have counsel present prior to any custodial interrogation (*id*. at pp. 444–445).

"When a suspect knowingly and intelligently waives the *Miranda* rights, 'law enforcement may interrogate, but if at any point in the interview [the suspect] invokes the right to remain silent or the right to counsel, "the interrogation must cease." ' [Citation.] Once the suspect has invoked, 'a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation .... [There is to be no] further interrogation by the authorities … unless the accused himself initiates further communication, exchanges, or conversations with the police.' (*Edwards*, *supra*, 451 U.S. at pp. 484–485, fn. omitted; accord, *People v. Gamache* (2010) 48

18.

Cal.4th 347, 384.) 'In the absence of such a bright-line prohibition, the authorities through "badger[ing]" or "overreaching" — explicit or subtle, deliberate or unintentional — might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request [to remain silent or] for counsel's assistance.' " (*Ramirez, supra,* 13 Cal.5th at pp. 1103–1104.)

A defendant who has waived their *Miranda* rights must make a "clear assertion" of the right to silence or counsel before officers must cease questioning. (*Davis v. United States* (1994) 512 U.S. 452, 460 (*Davis*).) "The applicability of the ' "rigid" prophylactic rule' of *Edwards* requires courts to 'determine whether the accused actually invoked his right[s] ....' " (*Id.* at p. 458, italics omitted.) "Ambiguous or equivocal references to an attorney or the right to silence do not require cessation of questioning. [Citations.] Whether the defendant made an invocation is analyzed from the perspective of a reasonable officer (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381), and takes into consideration the context of the statement [citation]. If 'a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right,' then the officer need not cease all questioning immediately." (*Ramirez*, *supra*, 13 Cal.5th at p. 1104, italics omitted.)

" 'A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case.' [Citation.] When evaluating the admissibility of a defendant's statements on appeal, we accept the trial court's resolution of disputed facts if supported by substantial evidence, and we independently determine from the undisputed facts and the facts properly found by the trial court whether the statements were illegally obtained." (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 16.) "The erroneous admission of statements obtained in violation of the Fifth Amendment is reviewed under the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24 [(*Chapman*)]). [Citation.] That test requires the People 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict

19.

obtained.' [Citation.] The standard is satisfied only if '[t]here is no reasonable possibility that the verdict would have been more favorable to defendant had [the] statements not been admitted.' " (*People v. Henderson* (2020) 9 Cal.5th 1013, 1029.)

### E.  Analysis

#### 1.  The First Interview

Here, as noted above, a defendant who has waived the *Miranda* rights must make a "clear assertion" of the right to silence or counsel before officers are required to cease questioning (*Davis*, *supra*, 512 U.S. at p. 460), and if "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right," then the officers need not cease all questioning immediately. (*Id*. at p. 459, italics in original.) For example, in *Ramirez*, our Supreme Court held the "[d]efendant did not clearly and unequivocally invoke his right to silence at the end of the … interview ... [when he] responded, 'I don't have nothing else to say to you guys.' " (*Ramirez*, *supra*, 13 Cal.5th at p. 1104.) The court found "defendant willingly participated in a long interview with the officers[,]" and he "remained steadfast in his denials and did not complain of the absence of an attorney, or interpose a request for one." (*Ibid*.) Therefore, "[v]iewed in context, a reasonable officer would have understood [the] defendant's statement to mean that he had nothing to add to his claims of innocence, not that he was invoking his right to silence." (*Ibid*.)

Additionally, in *People v. Thomas* (2012) 211 Cal.App.4th 987 (*Thomas*), the court held the defendant's statement, " 'I ain't talking no more and we can leave it at that,' " was not an unambiguous invocation of his right to remain silent. (*Id*. at p. 1006, italics omitted.) Rather in context, "it was merely an expression of momentary frustration both with the detectives' failure to accept [the defendant's] repeated insistence that he was not present during the shootings and with [the deputy's] immediately preceding statement [that the defendant] was 'hiding something.' " (*Ibid*.) The court explained the transcript of the interview showed the defendant "repeatedly expressed

20.

frustration during the interview" (*ibid.*), and "[w]hen viewed in conjunction with his earlier expressions of frustration during the interview," the purported invocation "was another expression of momentary frustration and, at most, was an ambiguous invocation of the right to remain silent." (*Id.* at p. 1007.)

Here, defendant did not clearly and unequivocally invoke his right to silence at the end of the first interview. Defendant was advised of *Miranda*, waived these rights, and then willingly participated in an hour-long interview with detectives. He repeatedly denied involvement in the robbery and claimed to have been under the influence of drugs at the time the crimes occurred. Detective Anderson continued to press defendant regarding the underlying offenses, but defendant remained steadfast in his denials. However, towards the end of the interview, Anderson specifically asked defendant about the robbery, and defendant replied, "Are we done?" Detective Anderson continued to probe and defendant continued to engage and stated that killing two people for money "doesn't mean that he's a[n] evil person"and that it is hard for the detectives to really understand what's going because the detectives "didn't grow up how [h]e grew up." Defendant then asked a second and third time, "Are we done?" and Anderson gave him the option of "say[ing] you don't wanna answer it[,]" but defendant continued to engage. Anderson asked defendant if he was sticking to his story, " 'I don't remember' " and defendant continued to deflect. Anderson ended the interview after asking defendant, "Are we done?" and defendant replied, "Yeah."

The statement, "Are we done?" was not a clear invocation of the right to silence. Although Detective Anderson ended the interview after the statement was made for the third time, he testified during the evidentiary hearing that "talking to [defendant] any further would have been pointless" and he "didn't see that pushing him would be fruitful." (See *People v. Martinez* (2010) 47 Cal.4th 911, 944, 950 (*Martinez*) [The statement " 'That's all I can tell you' " was interpreted to mean " '[t]hat's all the information [the defendant] had for [the officer],' " rather than the defendant invoking his

21.

right to silence].)  Similar to *Thomas*, the statement "Are we done?" was not an invocation of his right to remain silent, but rather "an expression of momentary frustration" that Detective Anderson was not accepting his repeated insistence he had no memory of the robbery.  (*Thomas*, *supra*, 211 Cal.App.4th at p. 1006.)  Considering the context of when the statements were made, defendant continued to engage with Detective Anderson and insist he was under the influence of drugs and had no memory of the robbery.  Further, the statement could also be interpreted to mean that defendant was simply asking Detective Anderson whether he had any additional questions for him.  Accordingly, we conclude that after defendant validly waived his *Miranda* rights, he did not invoke his right to remain silent because the statement, "Are we done?" constituted an "[a]mbiguous or equivocal reference[] ... to silence [and thus] d[id] not require cessation of questioning."[22]  (*Ramirez*, *supra*, 13 Cal.5th at p. 1104.)

Nonetheless, defendant cites to *People v. Villasenor* (2015) 242 Cal.App.4th 42, in support of his contention that "[e]ven if [his] reply to the detective's question could reasonably be viewed as an 'expression of frustration,' as the trial court concluded [citation omitted], it was also an unambiguous invocation of his right[.]"  (Italics omitted.)  However, *Villasenor* is clearly distinguishable.  In *Villasenor*, the defendant "told [the detective] to take him home 13 times within a matter of 14 minutes.  During this short span of time, he also tried to take his cell phone from the detective to call his parents to pick him up [and] [w]hen this did not work, he repeatedly told the detective to call his parents."  (*Id*. at p. 65.)  "At one point, [the] defendant even tied his demands to be taken home and to have his parents called to his 'rights,' saying, 'I know my rights,' prompting the detective to respond, 'I know your rights, too, partner,' and to which [the] defendant replied: 'So take me home then.' "  (*Ibid*.)  The court concluded that "[t]he only right [the] defendant could possibly have been referring to is his right to end the

---

[22]     Compare with "We are done."

22.

interrogation [and] [a]lso within this 14-minute span of time, [the] defendant asked how long he could be held without charges being filed and then asked – three times – to wait out the 48 hours so he could then go home." (*Ibid.*) Accordingly, the court held "a reasonable officer in [the detective's] position would have understood [the] defendant's repeated demands to be taken home, to have his parents called to pick him up, and to wait out the 48 hours, to be an unambiguous invocation of his right to end the interrogation." (*Ibid.*)

Here, as noted above, the only statement defendant made that could even be considered "at most ... an ambiguous invocation of the right to remain silent" (*Thomas, supra*, 211 Cal.App.4th at p. 1007), was the statement, "Are we done?" Other than this one statement, defendant responded to questioning and gave no other indication to Anderson he wanted to end this interview. Unlike in *Villasenor*, defendant made no repeated and unequivocal demands, but rather gave ambiguous responses, which became even more ambiguous after he continued to engage with Anderson. Therefore, defendant did not invoke his right to remain silent under *Miranda*.

### 2. The Second Interview

At the outset, Detective Anderson was not required to provide defendant with his *Miranda* rights before initiating this second interview with defendant. Our Supreme Court has held " 'readvisement is unnecessary where the subsequent interrogation is 'reasonably contemporaneous' with the prior knowing and intelligent waiver. [Citations.] The courts examine the totality of the circumstances, including the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights.' " (*Ramirez, supra*, 13 Cal.5th at p. 1106, quoting *People v. Mickle, supra*, 54 Cal.3d at p. 170.) Here, a 36-hour gap between the first and second interview was reasonably contemporaneous with the prior waiver,

especially considering defendant was interviewed by the same individual, Detective Anderson. (See *People v. Pearson* (2012) 53 Cal.4th 306, 317 [Interrogations were reasonably contemporaneous where there was a 27-hour gap between them]; *People v. Williams* (2010) 49 Cal.4th 405, 434–435 (*Williams*) [same for 40-hour gap]; *People v. Mickle*, at p. 171 [same for 36-hour gap].) Accordingly, no readvisement of defendant's *Miranda* rights were required.

Because we conclude Detective Anderson was not required to provide defendant his *Miranda* rights before initiating this second interview with defendant, we therefore must determine whether the three separate statements, "I can't talk right now" was a clear invocation of his right to remain silent. "However, although our cases made clear ' "[a] desire to halt the interrogation may be indicated in a variety ways," ' [citation], they also made clear that 'the words used by the suspect "must be construed in context." ' " (*People v. Parker* (2017) 2 Cal.5th 1184, 1220.)

We find both *Williams* and *Martinez* instructive. In *Williams*, our Supreme Court viewed the defendant's statement, " 'I don't want to talk about it,' " in context and concluded it was not "an unambiguous invocation of the right to remain silent," citing a number of cases standing for the proposition that " '[a] defendant has not invoked his or her right to silence when the defendant's statements were merely expressions of passing frustration or animosity toward the officers, or amounted only to a refusal to discuss a particular subject covered by the questioning.' " (*Williams*, *supra*, 49 Cal.4th at pp. 433-434, quoting *People v. Rundle* (2008) 43 Cal.4th 76, 115, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421; see also *Thomas*, *supra*, 211 Cal.App.4th at pp. 1006–1007 [viewed in the context of a number of "expressions of frustration," the defendant's single statement, " 'I ain't talking no more and we can leave it at that,' " could be viewed as "another expression of momentary frustration and, at most, was an ambiguous invocation of the right to remain silent"].)

Additionally, in *Martinez*, the court concluded that, in context, the statements, " 'I don't want to talk anymore right now,' " and " 'That's all I can tell you,' " did not amount to an unambiguous and unequivocal invocation of the right to remain silent. (*Martinez*, *supra*, 47 Cal.4th at pp. 949–951.)  In *Martinez*, a detective gave *Miranda* advisements to the defendant, who agreed to an interview.  (*Id*. at pp. 944–945.)  When the defendant said, " 'That's all I can tell you,' " the detective ended the interrogation (*id*. at p. 944), and the next morning, two other detectives met with the defendant, they reminded him he had previously waived his *Miranda* rights, and then continued to interrogate him.  (*Id*. at pp. 944–946.)  During the interrogation, the defendant said, " 'I don't want to talk anymore right now.' "  In response, the detectives said they intended to take a break, urged the defendant to " 'think about it,' " and said they would come back and talk to him.  (*Id*. at pp. 951–952.)  The defendant replied, " 'Okay,' " and the detectives resumed their questioning after a break.  (*Id*. at p. 952.)

Our Supreme Court concluded defendant did not invoke his right to remain silent during the initial interrogation because the defendant's remark, " 'That's all I can tell you,' " was reasonably viewed as merely meaning, " 'That's my story, and I'll stick with it.' "  (*Martinez*, *supra*, 47 Cal.4th at pp. 949–950.)  The court further concluded the defendant's statement during the second interview, " 'I don't want to talk anymore,' " also did not amount to a clear invocation of his right to silence.  (*Id*. at pp. 951–952.)  The court reasoned the context in which the statement is made matters.  This statement came "during the course of an interrogation," rather than at the beginning of the interrogation or contemporaneous to the initial *Miranda* advisements.  (*Id*. at p. 951.)  The court also observed the detectives employed " 'good police practice' " aimed at clarifying the defendant's statement by proposing a break and encouraging him to " 'think about it.' "  (*Id*. at pp. 951–952.)  The court reasoned the "[d]efendant could have responded negatively and explained that he would not be interested in talking further,

even after a break. He did not. Instead, by saying, 'Okay,' he in effect agreed to allow the detectives to return for more questioning." (*Id*. at p. 952.)

Here, at the outset, the statement, "I can't talk right now" is not an unambiguous invocation of the right to remain silent.**23** These statements came "during the course of an interrogation," rather than at the beginning of the interrogation or contemporaneous to the *Miranda* advisements (*Martinez*, *supra*, 47 Cal.4th at p. 951), and it was ambiguous because the statement had " 'more than one interpretation or reference' or 'ha[d] a double meaning.' " (*Anderson v. Terhune* (9th Cir. 2008) 516 F.3d 781, 787.) This statement became even more unclear when defendant continued to engage with Detective Anderson during the entirety of the interview by responding, "I'm no killer," "I'm only 22 years old," and "[I] [c]an't do life in prison." Although he began to cry at the four-minute mark and continued to cry while telling Anderson, "I can't talk right now[,]" it is clear the emotion was related to both frustration and the feeling of remorse regarding the underling offenses. (*Thomas*, *supra*, 211 Cal.App.4th at p. 1006.) Additionally, Anderson gave him the opportunity to end the interview after defendant told him, "I can't talk right now. My head hurts. My hair itches," when he responded:

> "This — I don't have much time. I gotta go back. We have leads, we're gonna be snatching up [Langston]. And then it will just – we've got other stuff trust me, but I want to see if — I'm giving you the opportunity to do the right thing now. You — this is the last card you got. After I leave you don't have anything else. That's it . We're done. All right?"

Detective Anderson, although not required to, had every right to clarify whether defendant was invoking his right to remain silent. (*Martinez*, *supra*, 47 Cal.4th at pp. 951–952 [" '[G]ood police practice' " to clarify whether a defendant wants to end the interview or continue speaking with the officers].) Therefore, we cannot confidently say defendant's invocation of his right to silence was " 'unambiguous[]' " from the

---

**23**    Compare with "I won't talk right now."

perspective of a reasonable officer.  (*Berghuis v. Thompkins*, *supra*, 560 U.S. at p. 381.) Accordingly, in light of the circumstances surrounding defendant's, "I can't talk right now" responses, we conclude a reasonable officer could have understood that defendant *might* be invoking his right to remain silent, but would not have understood whether he was *in fact* invoking his right to remain silent.  (See *Davis*, *supra*, 512 U.S. at p. 459.)

  *F.*  *Harmless Error*

  However, even assuming a *Miranda* violation occurred, we conclude defendant was not prejudiced.  As noted above, "The erroneous admission of statements obtained in violation of the Fifth Amendment is reviewed under the *Chapman* standard [citation]. [Citation.]  That test requires the People 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'  [Citation.]  The standard is satisfied only if '[t]here is no reasonable possibility that the verdict would have been more favorable to defendant had [the] statements not been admitted.'  [Citation.] Because confessions, ' "[a]lmost invariably" will provide persuasive evidence of a defendant's guilt ..., the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial under the traditional harmless-error standard.' " (*People v. Henderson*, *supra*, 9 Cal.5th at p. 1029.)  In *People v. Cahill* (1993) 5 Cal.4th 478 (*Cahill*), our Supreme Court acknowledged an erroneous admission of a confession "might be found harmless, for example, (1) when the defendant was apprehended by the police in the course of committing the crime, (2) when there are numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence, or (3) in a case in which the prosecution introduced, in addition to the confession, a videotape of the commission of the crime."  (*Id*. at p. 505.)  Certainly, *People v. Cahill's* list of examples is not intended to be exhaustive, but it does exemplify the kind of strong evidence required to satisfy the *Chapman* standard.

Here, the evidence in this case satisfies this high standard. Most of the evidence presented in this case falls within the list of evidence *Cahill* described as establishing harmlessness. First, law enforcement located defendant hiding inside a shed in a backyard, which was in close proximity to the convenience market where the robbery/murders had occurred. Deputies searched defendant and located a pair of Nikes next to him — matching the shoes worn by the suspect who was observed in the surveillance footage with the white gloves and handgun. Further, deputies located over a thousand dollars "in a rolled up mesh" inside the shed — one of the $100 bills had Juan Aceves's blood on it.

Second, multiple surveillance videos showed the entirety of the robbery and shootings. In the videos, the suspect wearing the white gloves shot both Heriberto and Juan. These white gloves were later found by law enforcement in the surrounding area where defendant was located. Further, law enforcement located a dark blue beanie with a New York Yankees' logo behind the convenience store, which contained defendant's DNA.

Finally, multiple eyewitness's testimony corroborated and established defendant's identity as the suspect seen in the surveillance footage. First, Jose N. and Modesto N., who were stopped at a red light at the corner of Main Street and Panama Road followed the individual who ran "eastbound on Panama and northbound on Carnation [¶] … [a]nd then turned left on Lana Street." He was described as wearing a black hoodie sweatshirt and "had a gun on his [¶] [l]eft hand" and cash register "in the other hand." Jose then observed this individual take off his black hoodie sweatshirt and "thr[o]w it in the yard" of the house at "the corner of Carnation and Lana Street." Second, Fidel C. testified he observed defendant "t[ake] off his sweater and he threw in on the ground and left" and later identified defendant in a six-pack lineup — corroborating both Jose N. and Modesto N.'s testimony. As *Cahill* makes clear, "[A]lthough in some cases a defendant's confession will be the centerpiece of the prosecution's case in support of a conviction, in

28.

many instances it will be possible for an appellate court to determine with confidence that there is no reasonable probability that the exclusion of the confession would have affected the result." (*Cahill*, *supra*, 5 Cal.4th at p. 505.) This is one of those cases. Accordingly, we conclude the confession was cumulative in light of the overwhelming evidence establishing defendant's culpability in the current case.

## II.    ASSEMBLY BILL 333

Assembly Bill 333 amended the language of section 186.22 to modify the showing necessary to prove gang offenses and gang enhancements (Stats. 2021, ch. 669, § 3, eff. Jan. 1, 2022), and added section 1109, requiring bifurcation of the trial of gang enhancements and substantive gang offense from that of the other underlying offenses upon a defendant's request. (§ 1109, subds. (a), (b).)

### A.    *Section 1109*

Defendant contends newly enacted section 1109 should apply retroactively to his case and "applies to both the gang enhancement and the gang-murder special circumstance[,]" and therefore requires reversal of his underlying convictions. The People deny section 1109 should apply retroactively and that defendant's claim is forfeited because "[s]ection 1109 did not change the requirement that defendant's request bifurcation of gang enhancements, nor did it impose a sua sponte duty on trial courts." Regardless, the People contend the lack of bifurcation constituted harmless error.

As we explain below, we agree the trial court's failure to bifurcate pursuant to section 1109 or under then existing law was harmless because there is no basis to conclude bifurcation would have affected the outcome of the trial. Accordingly, we need not consider whether section 1109 applies retroactively or the merits of defendant's bifurcation motion.[24]

---

[24]    The issue of whether section 1109 applies retroactively to cases that are not yet final is currently under review by our Supreme Court in *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743.

*1. Applicable Law*

"Pursuant to section 1109, subdivision (a), upon a defendant's request, a case in which a gang enhancement is charged under section 186.22, subdivision (b) or (d) must be tried in separate phases.  Section 1109, subdivision (b) provides that '[i]f a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.  This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22.' " (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129 (*Ramos*).)

Section 1109 was added because:

> "(e) "California courts have long recognized how prejudicial gang evidence is.  (See, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 193.) Studies suggest that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions.  [Citations.]  The mere specter of gang enhancements pressures defendants to accept unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence.

> "(f) Bifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact."  (Stats. 2021, ch. 669, § 2, subds. (e), (f).)

*2. Analysis*

Defendant's right to bifurcation under section 1109 is purely statutory.  (*Ramos*, *supra*, 77 Cal.App.5th at pp. 1131–1133 [concluding section 1109 error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836].)  " 'Typically, a defendant who has established error under state law must demonstrate there is a reasonable probability that in the absence of the error he or she would have obtained a more favorable result.' " (*People v. Anzalone* (2013) 56 Cal.4th 545, 553; accord *People v. Epps* (2001) 25 Cal.4th 19, 29 [where the error "is purely one of state law, the *Watson* harmless error test applies"].)

Recently, in *People v. Tran* (2022) 13 Cal.5th 1169, our Supreme Court held the failure to bifurcate pursuant to section 1109 is not structural error. (*Tran, supra,* at pp. 1208–1210.) The court also rejected the defendant's argument the *Chapman* standard for federal constitutional error applies, reasoning the admission of gang evidence in that case was not so prejudicial that it rendered the trial " 'fundamentally unfair.' " (*Tran, supra,* at p. 1209.) Instead, it evaluated the trial court's failure to bifurcate under the *Watson* standard. (*Tran, supra,* at pp. 1209–1210.)

### 3. Harmless Error

In assessing prejudice under *Watson*, "an appellate court may consider 'whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 870, italics omitted.)

Here, defendant argues "the failure to bifurcate the gang enhancement and gang-murder special circumstance allegations damaged [his] chance of being acquitted of murder based on the jurors' reasonable doubts about the reliability of [his] confession to have been the gunman in the robbery" and that "the failure to bifurcate reduced the possibility that the jurors would acquit [him] based on the weaknesses in the prosecution's case." We disagree. First, as we discussed in detail in part I.D., *ante*, the evidence of defendant's guilt was overwhelming. Second, although defendant, argues "[t]he court's failure to bifurcate ... resulted in [his] jury hearing an enormous amount of extremely inflammatory evidence about the [CBC] gang and [his] allegiance to it[,]" his gang membership was highly relevant for identity, motive, or intent under Evidence Code section 1101, subdivision (b). It was relevant for the jury to hear that gang members commit robberies because "[t]hey benefit from the financial gain potentially of the robbery itself" and that "[c]ommitting a crime in association with other gang members helps insure you have a higher likelihood of getting away it." Further, any potential

prejudice from the gang evidence was mitigated when the trial court provided the jury with a limiting instruction regarding its consideration of the gang evidence, which we presume it followed. (*People v. Pearson* (2013) 56 Cal.4th 393, 414 ["We presume that jurors understand and follow the court's instructions"].)

Accordingly, we conclude defendant was not prejudiced by the failure to bifurcate the gang enhancement and gang special circumstance allegations. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051 ["Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendants' actual guilt."].) Therefore, we affirm defendant's conviction in its entirety. (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [failure to bifurcate was harmless under *Watson* standard in light of " 'overwhelming' " evidence in support of robbery convictions, stating "[e]ven if section 1109 applied retroactively to this case — an issue we need not and do not decide here – E.H. cannot show it is 'reasonably probable' he would have obtained a more favorable result if his trial had been bifurcated"].)

B.      *Sections 186.22 & 190.2, subdivision (a)(22)*

Defendant further contends he entitled to the benefit of newly amended section 186.22 and that both the gang enhancements and gang special circumstance allegations must be dismissed. The People concede the amendments to section 186.22 apply retroactively and that "[u]nder these circumstances, remand is required." However, the People disagree that the gang-murder special circumstance allegations must be dismissed because the Legislature could not unconstitutionally amend section 190.2, subdivision (a)(22), created by the voters via Proposition 21. Based on our Supreme Court's holding in *Rojas*, we conclude defendant is entitled to a reversal of both his section 186.22 gang enhancements and the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)). (*Rojas*, *supra*, 15 Cal.5th at p. 580.) However, we also conclude the People are

32.

entitled to retry defendant on the enhancements and gang special circumstance allegations if they so choose.**25**

   *1. Gang Enhancements (§ 186.22, subd. (b))*

  As to counts 1, 2, 3, 4, and 6, the jury found true gang enhancements (§ 186.22, subd. (b)). At the time of defendant's trial, "criminal street gang" was defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f).) Assembly Bill 333 revised the definition of "criminal street gang" to require that members "collectively" (no longer "individually or collectively") engaged in a pattern of criminal activity. (§ 186.22, subd. (f); *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1086.)

  Additionally, Assembly Bill 333 redefined " 'pattern of criminal gang activity' " (§ 186.22, subd. (e)(1)), a necessary requirement to proving the existence of a "criminal

---

**25** In supplemental briefing, defendant further contends: (1) he is entitled to make a record that may be helpful at his future youth offender parole hearing, even though he was sentenced to two consecutive LWOP terms, and that distinguishing from individuals sentenced to a term allowing for the possibility of parole and individuals sentenced to LWOP violates equal protection; and (2) that the abstract of judgment must be amended to strike the $300 parole revocation fine "because [he] was sentenced to life imprisonment without [the] possibility of parole." As we discuss in detail below, defendant is entitled to a reversal of the gang-murder special circumstance findings, as alleged in counts 1 and 2, which was the basis for the two consecutive LWOP sentence (§ 190.2, subd. (a)). Therefore, the trial court on remand can address: (1) whether defendant is entitled to make a record that may be helpful at a future youth offender parole hearing pursuant to section 3051 and *Franklin, supra,* 63 Cal.4th 261; and (2) whether imposition of the parole revocation fine is required. (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["the full resentencing rule allows a court to revisit all prior resentencing decisions when resentencing a defendant"] accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["'the full resentencing rule'"].)

street gang" and thus a "prerequisite to proving the gang crime and the gang enhancement." (See § 186.22, subds. (a), (b)(1); *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 823.) " 'The offenses comprising a pattern of criminal gang activity are referred to as predicate offenses.' " (*Rodriguez, supra,* at p. 822.) At the time of defendant's trial, "pattern of criminal activity" meant "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (Former § 186.22, subd. (e).) Under this former definition, the prosecution only had to prove that those associated with a gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another. (Former § 186.22, subd. (e); see *People v. Sek* (2022) 74 Cal.App.5th 657, 665.) It was unnecessary to prove the predicate offenses were gang related. (Former § 186.22, subd. (e); *People v. Rodriguez*, *supra*, 75 Cal.App.5th at p. 822.)

The amended statute made several changes to the definition and limited type of predicate offenses sufficient to prove the gang enhancement. "First, the predicate offenses now must have been committed by two or more 'members' of the gang (as opposed to any persons). [Citation.] Second, the predicate offenses must be proven to have '*commonly* benefited a criminal street gang.' [Citation, italics in original.] Third, the last predicate offense must have occurred within three years of the date of the currently charged offense. [Citation.] Fourth, the list of qualifying predicate offenses has been reduced. [Citation.] And fifth, the currently charged offense no longer counts as a predicate offense." (*People v. E.H.*, *supra*, 75 Cal.App.5th at pp. 477–478; § 186.22, subd. (e)(1), (2).) Most notably, the new element that the predicate offenses "commonly benefited a criminal street gang" requires that "the common benefit of the offense is more

34.

than reputational." (§ 186.22, subd. (e)(1).) A new subdivision (g) was also added specifying that "[e]xamples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

Here, the parties agree, as do we, that Assembly Bill 333's amendments to section 186.22 apply retroactively to this this case, which is not yet final on appeal, and that remand is required. Since the amendments to section 186.22 increase the threshold for conviction of a section 186.22 enhancement, defendant — whose judgement of conviction is not yet final — is entitled to the benefit of these changes to the law. (*Ramos*, *supra*, 77 Cal.App.5th at p. 1127.) Further, the jury was not allowed to consider whether the evidence presented at trial was sufficient to prove a "pattern of criminal activity" under the amended law. As noted above, the revised definition of "pattern of criminal activity" increased the threshold of proof for the predicate offenses necessary for the gang enhancement. (§ 186.22, subd. (e)(1).) This included the notable new requirement of a common benefit to the gang derived from the predicate offenses, and that benefit be more than reputational (§ 186.22, subd. (e)(1) [" 'pattern of criminal gang activity' means ... the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational"].) Accordingly, the gang enhancements (§ 186.22, subd. (b)) alleged in counts 1, 2, 3, 4, and 6 must be reversed.

2.    *Gang-Murder Special Circumstance (§ 190.2, subd. (a)(22))*

On counts 1 and 2, the jury also found true the gang-murder special-circumstance allegation (§ 190.2, subd. (a)(22)). Section 190.2, subdivision (a)(22) was enacted as a part of Proposition 21, an initiative measure adopted by the electorate in the March 2000 primary election. (*People v. Shabazz* (2006) 38 Cal.4th 55, 65.) Section 190.2, subdivision (a)(22) makes first degree murder a capital crime if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal

street gang, *as defined in subdivision (f) of Section 186.22*, and the murder was carried out to further the activities of the criminal street gang." (Italics added.)

Prior to *Rojas*, the Court of Appeal was divided as to whether Assembly Bill 333 unconstitutionally amended Proposition 21. (See, e.g., *People v. Lee* (2022) 81 Cal.App.5th 232, 245, review granted Oct. 19, 2022, S275449 [Assembly Bill 333 did not unconstitutionally amend Proposition 21]; *People v. Rojas* (2022) 80 Cal.App.5th 542, 553–558, review granted Oct. 19, 2022, S275835 [Assembly Bill 333 did unconstitutionally amend Proposition 21].) During the pendency of this appeal, our Supreme Court resolved this dispute and held that "applying Assembly Bill 333's definition of 'criminal street gang' to the gang-murder special circumstances does not unconstitutionally amend section 190.22(a)(22) [Proposition 21]." (*Rojas*, *supra*, 15 Cal.5th at p. 580.) Our Supreme Court's rejection of the People's argument that Assembly Bill 333's changes to the definitions of "criminal street gang" and "pattern of criminal gang activity" unconstitutionally amended Proposition 21 requires us to vacate the gang-murder special circumstance findings.

Accordingly, we vacate both the gang enhancement allegations (§ 186.22, subd. (b)), as alleged in counts 1, 2, 3, 4, and 6, *and* the gang-murder special circumstance findings (§ 190.2, subd. (a)(22)), as alleged in counts 1 & 2, and remand the matter to afford the People the opportunity to retry these allegations under the current law. (*Ramos*, *supra*, 77 Cal.App.5th at p. 1128.)

## DISPOSTION

Defendant's sentence is vacated, and this matter is remanded for resentencing consistent with this opinion. Pursuant to Assembly Bill 333, we reverse both the gang enhancements (§ 186.22, subd. (b)), as to counts 1, 2, 3, 4, and 6, and the gang-murder special circumstance allegations (§190.2, subd. (a)(22)), as to counts 1 and 2, but conclude the People are not foreclosed from retrying defendant on these enhancements and allegations on remand. The trial court shall also address whether defendant is

entitled to make a record that may be helpful at a future youth offender parole hearing pursuant to section 3051. Thereafter, the trial court is directed to file an amended and corrected abstract of judgment and transmit copies thereof to the appropriate authorities. In all other respects, the judgment is affirmed.

FRANSON, J.

WE CONCUR:


DETJEN, Acting P. J.


SMITH, J.